1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

Kyndra S. Miller, SBN 224343
755 Baywood Drive, Second Floor
Petaluma, CA  94954
Tel/Fax:  877-420-4660
kyndra@cannabusinesslaw.com

Shelley K. Mack, SBN 209596
1416 Bates Road
McKinleyville, California 95519
Tel: (707) 268-0445
Fax: (707) 667-0318
shelley@martinmacklaw.com

Attorneys for Plaintiff
MICHELLE CHARMAINE LAWSON

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

## OAKLAND DIVISION

MICHELLE CHARMAINE LAWSON,

        Plaintiff,

vs.

CITY OF ARCATA; THOMAS CHAPMAN, individually and in his official capacity as City of Arcata Chief of Police; TOD DOKWEILER, individually and in his capacity as Lieutenant and Detective Sergeant for the City of Arcata; ERIC LOSEY, individually and in his capacity as Detective Police Officer for the City of Arcata; KRYSTLE ARMINIO, individually and in her capacity as a Police Officer for the City of Arcata; KAREN DIEMER, individually and in her official capacity of City of Arcata City Manager; and DOES 1 through 100,

        Defendants.

)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)

CASE NO. 4:18-cv-07238-YGR

**SECOND AMENDED COMPLAINT FOR:**

1. **DENIAL OF EQUAL PROTECTION IN VIOLATION OF THE FOURTEENTH AMENDMENT (42 U.S.C. § 1983)**
2. **DELIBERATELY INDIFFERENT POLICIES, PRACTICES, CUSTOMS, TRAINING AND SUPERVISION IN VIOLATION OF THE FOURTEENTH AMENDMENT AND (42 U.S.C. § 1983)**
3. **CONSPIRACY TO DEPRIVE PLAINTIFF OF CONSTITUTIONAL RIGHTS (42 U.S.C. § 1985(3))**
4. **CONSPIRACY TO DEPRIVE PLAINTIFF OF CONSTITUTIONAL RIGHTS (42 U.S.C. § 1983)**
5. **CIVIL CONSPIRACY**
6. **GROSS NEGLIGENCE**
7. **INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS**
8. **NEGLIGENT INFLICTION OF EMOTIONAL DISTRESS**

**DEMAND FOR JURY TRIAL**

PLAINTIFF MICHELLE CHARMAINE LAWSON, by and through her undersigned counsel, brings this action against DEFENDANTS CITY OF ARCATA, THOMAS CHAPMAN (individually and in his official capacity as City of Arcata Chief of Police), TOD DOKWEILER (individually and in his official capacity as Lieutenant and Detective Sergeant for the City of Arcata); ERIC LOSEY (individually and in his official capacity as a Detective Police Officer for the City of Arcata); KRYSTLE ARMINIO (individually and in her official capacity as a Police Officer for the City of Arcata); KAREN DIEMER (individually and in her official capacity as City of Arcata City Manager) and DOES 1 through 100, alleging claims for denial of equal protection in violation of the Fourteenth Amendment (42 U.S.C. § 1983) (Count I), deliberately indifferent policies, practices, customs, training and supervision in violation of the Fourteenth Amendment and 42 U.S.C. § 1981 (42 U.S.C. § 1983) (Count II), conspiracy to deprive her of her constitutional rights in violation of 42 U.S.C. §1985(3) (Count III), conspiracy to deprive her of her constitutional rights in violation of 42 U.S.C. § 1983 (Count IV), civil conspiracy (Count V), gross negligence (Count VI), intentional infliction of emotional distress (Count VII) and negligent infliction of emotional distress (Count VIII).  In support of her claims, Plaintiff alleges as follows:

## **INTRODUCTION**

1.     Plaintiff files this Second Amended Complaint ("Complaint") against Defendants City of Arcata, Thomas Chapman (former Chief of Police for the City of Arcata), Tod Dokweiler (Lieutenant and Detective Sergeant for the City of Arcata), Eric Losey (Detective for the City of Arcata), Krystle Arminio (Police Officer for the City of Arcata) and Karen Diemer (City Manager for the City of Arcata) on information and belief that Defendants engaged in acts and/or omissions, and collectively conspired to engage in such acts and/or omissions, to deny Plaintiff the equal protection of the laws in violation of the Fourteenth Amendment to the United States Constitution. In addition, Defendants' actions and/or omissions, and lack of training and supervision resulted in deliberately indifferent policies, practices and customs in violation of the Fourteenth Amendment to the United States Constitution.

SECOND AMENDED COMPLAINT

MICHELLE CHARMAINE LAWSON v. CITY OF ARCATA *et al.*

**PARTIES**

2.      Plaintiff Michelle Charmaine Lawson is a United States citizen residing in the City of Perris, Riverside County, California.  Plaintiff is the mother of the deceased David Josiah Lawson ("Mr. Lawson").  Plaintiff is an African-American female and has never been a resident of Humboldt County.  The late Mr. Lawson was an African-American male and was a temporary resident of Humboldt County solely for the purpose of attending Humboldt State University ("HSU") in Arcata, California.

3.      Upon information and belief, Defendant City of Arcata ("City") is a municipal corporation, organized under the laws of the State of California, with the capacity to sue and be sued.  Upon information and belief, Defendant City is the legal and political governmental entity responsible for the actions of the Arcata Police Department ("APD") and its officials, agents, and employees.  Defendant City is sued in its own right and on the basis of the acts and omissions of its officials, agents, and employees, including the APD, former APD Police Chief Thomas Chapman ("Chapman") and its City Manager, Karen Diemer ("Diemer").

4.      On information and belief, Defendant Thomas Chapman is a Caucasian male and a citizen of the United States who resides in Humboldt County, California.  Defendant Chapman was the City's Chief of Police on April 15, 2017 when Mr. Lawson was murdered and continued to serve as the City's Chief of Police until his sudden resignation on or about April 10, 2018.  At all relevant times, Defendant Chapman was acting within the scope and course of his employment and under the color of state law.  In his official capacity as the City's Chief of Police, Defendant Chapman directed the APD's administration and operation pursuant to the Arcata Municipal Code and guidelines, customs, policies and practices set by the City.  During his period of employment as Defendant City's Chief of Police, Defendant Chapman was responsible for, *inter alia*, leading and overseeing the investigation of all homicide cases under his jurisdiction; for setting, determining and/or implementing APD customs, polices, practices and procedures applicable to homicide investigations; and for ensuring that APD officers under his authority were appropriately trained and supervised.  To that end, Defendant Chapman established policy and was a final decisionmaker for the City of Arcata Police Department.

5.      On information and belief, Defendant Tod Dokweiler ("Dokweiler") is a Caucasian male and a citizen of the United States who resides in Humboldt County, California.  Defendant Dokweiler was an APD Detective Sergeant on April 15, 2017 when Mr. Lawson was murdered. On or about January 2018, Defendant Dokweiler was promoted to APD Lieutenant.   On information and belief, and at all times relevant to this Complaint, with the possible exception of a few months' time when the APD was under the leadership of Interim Chief of Police Richard Ehle ("Mr. Ehle"), Defendant Dokweiler has been the lead investigator in charge of the APD's investigation into Mr. Lawson's murder, acting within the scope and course of his employment and under the color of state law.

6.      On information and belief, Defendant Eric Losey ("Losey") is a Caucasian male and a citizen of the United States who resides in Humboldt County, California.  Defendant Losey was an APD officer on April 15, 2017.   He was promoted to the rank of detective just before responding to the scene of Mr. Lawson's murder, and continued to serve as an APD detective until his resignation in or around August 2017. At all relevant times, Defendant Losey was acting within the scope and course of his employment and under the color of state law.  On information and belief, Defendant Losey is currently employed by the Humboldt County Sheriff's Department ("HCSD").

7.      On information and belief, Defendant Krystle Arminio ("Arminio") is a Caucasian female and a citizen of the United States who resides in Humboldt County, California.  Defendant Arminio was an APD officer on April 15, 2017, when Mr. Lawson was murdered, acting within the scope and course of her employment and under the color of state law. Defendant Arminio was one of the first APD officers to arrive at the scene of Mr. Lawson's murder on April 15, 2017.

8.      On information and belief, Defendant Karen Diemer is a Caucasian female and a citizen of the United States who resides in Humboldt County, California.  At all times relevant to this Complaint, Defendant Diemer has served as the City Manager for Defendant City of Arcata, acting within the scope and course of her employment and under the color of state law.  In her official capacity as Defendant City of Arcata's City Manager, Defendant Diemer is responsible for, *inter alia*, supervising the City's Chief of Police, and serving as an official spokesperson on

behalf of Defendant City.  To that end, Defendant Diemer established policy and was a final decisionmaker for the City of Arcata.

9.   Each of the acts and omissions complained of was undertaken and each violation of Plaintiff's rights occurred pursuant to the unlawful policies, practices, and customs of Defendants, as alleged herein.

10.   In connection with the acts and omissions complained of herein, each Defendant was acting or omitting to act on behalf of the City of Arcata and/or at the direction of another Defendant on the City's behalf.

11.   The acts, omissions and/or misconduct of each Defendant, as alleged herein, were adopted, authorized, ratified, approved, and/or condoned by the relevant policy makers for Defendant City, including but not limited to Defendants Chapman and Diemer.

12.   Unless otherwise specified, each of the complained violations of law alleged herein was intentionally committed by Defendants, their officials, agents, and/or employees, acting under color of state law.

### JURISDICTION AND VENUE

13.   This Court has subject matter jurisdiction over Plaintiff's claims pursuant to 28 U.S.C. §§ 1331 and 1343(a)(3) and (4).  Plaintiff brings this action under 42 U.S.C. § 1983 to vindicate rights established by the Fourteenth Amendment to the United States Constitution and other applicable federal laws.  Plaintiff's state law claims arise from the same occurrences as her federal constitutional claims and are within this Court's supplemental jurisdiction pursuant to 28 U.S.C. § 1367.

14.   This Court has personal jurisdiction over Defendant City of Arcata because it is a political subdivision of the State of California located in Humboldt County.  The Court has personal jurisdiction over Defendants Chapman, Dokweiler, Losey, Arminio and Diemer because, during all times relevant to this Complaint, they worked and/or resided in Humboldt County, California.

15.   Venue is proper in the Northern District of California under 28 U.S.C. § 1391(b), as the Defendants are located in the Northern District of California and all the events, acts and/or

omissions complained of herein occurred in this District.

## FACTUAL ALLEGATIONS

16.     Defendant City is a small college town located in northern Humboldt County, California.  Nearly 300 miles north of San Francisco, Defendant City, and Humboldt County more broadly, are famously remote and isolated locales on the far northern California coast, situated behind the "Redwood Curtain" – a moniker recalling the culture of the former Eastern bloc countries behind the "Iron Curtain" and used by locals and non-locals alike to denote the region's lack of urban sophistication, remote and sparsely developed geography, and a notably provincial, insular "locals versus outsiders" mentality widespread amongst Humboldt County residents and natives.  This pervasive preference for local Humboldt County residents over "outsiders" is widespread amongst county and municipal elected representatives, officials and policymakers throughout Humboldt County, including but not limited to those employed by or otherwise working on behalf of Defendant City.

17.     The most recent U.S. Census Department data for Defendant City shows that the City of Arcata had a total estimated population of 17,403 as of April 1, 2010, and a total estimated population of 18,257 as of July 1, 2018 (the most recent date for which data is available).  As of July 1, 2018, the U.S. Census Department reported that approximately 79.4% of Defendant City's population was of white or Caucasian descent, and only an estimated 2.6% of Defendant City's population was of African-American descent.

18.     Defendant City is home to Humboldt State University ("HSU"), the northernmost and arguably most remote institution in the California State University ("CSU") system.  With more than 8,500 enrolled, HSU's students comprise a significant portion of the overall population of Defendant City and contribute a large percentage of Defendant City's overall population of non-Caucasian persons of color.  According to data published by HSU's Office of Institutional Effectiveness, during the 2016-2017 academic year (the school year during which Mr. Lawson was murdered), HSU had a total enrollment of 8,503 students, of whom 271 (3.2%) were African-American, 3,715 (43%) were white or Caucasian, 2,869 (33.7%) were Latinx, and

a total of 4,098 (48%) were students of color or mixed-race.  As a part of the California State University System, HSU attempts to ensure its incoming classes are representative of the general demographics of California's college-ready graduating high school seniors as a whole, not just those in HSU's own geographic region, which is markedly less racially diverse.

19.     The lion's share of HSU's minority student population is recruited from much more racially and culturally diverse areas of Southern California, and the sharp "town versus gown" divide in Defendant City is exacerbated by (1) the fact that HSU's student population is much more heavily minority than the native population of Humboldt County at large, and Defendant City in particular; and (2) the fact that most HSU students of color are not Humboldt County locals and typically do not remain in Humboldt County after completing their education at HSU.  As HSU President Dr. Lisa Rossbacher ("Dr. Rossbacher") told the HSU Lumberjack student newspaper in April 2017 just after Mr. Lawson's murder, "[t]here isn't a lot of ethnic and racial diversity in this region, except for what the University contributes.  We do end up being a very diverse community as a university in the midst of a region that is far less diverse.  That certainly creates some tensions."

20.     Some of those racial "tensions" referenced by Dr. Rossbacher in her 2017 Lumberjack interview were exemplified by the incident Dr. Rossbacher described in an email sent to the HSU campus community on or around November 2015.  In that email, Dr. Rossbacher described a racist attack on two (2) female African-American HSU students in downtown Arcata on the evening of Friday, November 6, 2015, when two (2) white men threw a glass bottle full of beer at the women from their truck before taunting and harassing them with racial slurs.  The perpetrators then chased the students from the scene of the attack, forcing the women to flee from the area on foot.

21.     Young African-American male students have also described stereotypically discriminatory and biased interactions with APD officers based on their race and their status as "non-locals" in the community.  Shortly after Mr. Lawson's murder, HSU student and Brothers United member Katauri Thompson ("Mr. Thompson"), a young African-American male from Riverside County, described to HSU's Lumberjack student newspaper being aggressively

SECOND AMENDED COMPLAINT

MICHELLE CHARMAINE LAWSON v. CITY OF ARCATA *et al.*

approached by APD officers with guns drawn only a few weeks earlier, on or around March or April 2017.  After he and a group of African-American male friends accompanying him were ordered by these APD officers to get down on the ground, Mr. Thompson asked the officers for a description of the person they were looking for.  The officers replied that "some people" were "in town from Florida" who were "armed" and "in the area."  The APD officers who aggressively detained Mr. Thompson and his companions in this encounter several weeks before Mr. Lawson's murder did so because they perceived college-age African-American males as likely to be armed and dangerous interlopers who were not local to Humboldt County.

22.     Over the past forty years, a total of four (4) HSU students have been murdered while attending the college.  One student was murdered in the 1980's in the Arcata Community Forest, while another was murdered by high school students sometime before 2000.  The third, 29-year-old African-American male Sociology student Corey Clark ("Mr. Clark"), was murdered in Eureka in October 2001 after HSU's annual homecoming football game.  Before beginning his degree at HSU, Mr. Clark graduated from the College of the Redwoods Police Academy.  No suspect was ever identified, and no one was ever arrested for or charged with Mr. Clark's murder.  Both of HSU's only student murder victims within the past 20 years were young African-American males, and both of their murders remain unsolved.

23.     In April 2017, Plaintiff's son, David Josiah Lawson, was a sophomore attending HSU and majoring in Criminal Justice.  During his sophomore year of college, Mr. Lawson was elected President of HSU's Brothers United, a community-service focused fraternal organization on campus comprised of African-American and other male HSU students of color.

24.     Mr. Lawson, who grew up and permanently resided in the City of Perris in Riverside County, was a temporary resident of Defendant City at the time of his death, residing in Humboldt County on only a short-term basis solely for the purpose of attending HSU.  None of Mr. Lawson's family members currently reside, or have ever resided, in Humboldt County, California.

25.     On the evening of April 14, 2017, continuing into the early morning hours of April 15, 2017, Mr. Lawson and his girlfriend, Renalyn Bobadilla ("Ms. Bobadilla") were

attending a birthday party at a friend's house in the City of Arcata, away from the Humboldt State University ("HSU") campus where Mr. Lawson attended college.  Mr. Lawson's girlfriend, Bobadilla, is an HSU student of color, and at all times relevant to this Complaint, Ms. Bobadilla was a permanent resident of Southern California, temporarily residing in Defendant City solely for purposes of attending college at HSU.  On information and belief, none of Ms. Bobadilla's family members currently reside, or have ever resided, in Humboldt County, California.

26.     Also attending the same party that evening was Lila Ortega ("Ms. Ortega"), accompanied by her friends Angelica McFarland ("Ms. McFarland"), Naiya Wilkins ("Ms. Wilkins"), and Casey Gleaton ("Ms. Gleaton").  On information and belief, Ms. Ortega is a female of Caucasian, Latinx, Native American and/or mixed-race descent and a longtime permanent resident of Humboldt County, with family members who also reside in Humboldt County on a permanent basis.  Ms. McFarland is a Caucasian female and a longtime permanent resident of Humboldt County, with immediate family members (including but not limited to her parents) who also reside in Humboldt County.  Ms. Wilkins is a Caucasian female who was a permanent resident of Humboldt County at the time of Mr. Lawson's murder.  On information and belief, Ms. Wilkins has family members who also reside in Humboldt County on a permanent basis.  Ms. Gleaton is a Caucasian female who was a permanent resident of Humboldt County at the time of Mr. Lawson's murder.  On information and belief, Ms. Gleaton has family members who also reside in Humboldt County on a permanent basis.

27.     Sometime in the early morning hours of April 15, 2017, Ms. Ortega called her boyfriend, Kyle Zoellner ("Mr. Zoellner"), to pick her and her friends up from the party.  Mr. Zoellner is a Caucasian male, a Humboldt County native, and a permanent resident of Humboldt County, with immediate family members (including but not limited to his parents) who also reside in Humboldt County on a permanent basis.  Upon information and belief, Mr. Zoellner's father is an employee of either the City of Arcata or the County of Humboldt.  At the time of Mr. Lawson's murder, Mr. Zoellner was employed as a chef for a local catering company.

28.     At approximately 2:30 a.m., when Mr. Lawson and Ms. Bobadilla were leaving the party with their friends Kyle Castillo and Kristoff Castillo (the "Castillo brothers"), Ms.

Ortega stopped them on their way out of the house.  Mr. Zoellner was with Ms. Ortega and Ms. Wilkins when they stopped Mr. Lawson, Ms. Bobadilla and the Castillo brothers to ask them about a missing cellular phone allegedly belonging to Ms. Ortega.  The Castillo brothers are both of Latinx descent.

29.    In an aggressive manner, Ms. Ortega accused Mr. Lawson, Ms. Bobadilla, and the Castillo brothers of stealing her missing iPhone, and demanded that they empty their pockets to prove that they did not have it.  Ms. Bobadilla and Ms. Ortega began arguing, and a physical altercation ensued amongst the three women.  At the same time, Mr. Zoellner was punched in the face by an unidentified person (the "First Altercation").

30.     Based on witness testimony, the First Altercation lasted for approximately one (1) minute.  After the First Altercation ended, Mr. Lawson, Ms. Bobadilla and the Castillo Brothers began to walk away from the front of the house where the First Altercation occurred.  As they were leaving, Ms. Ortega and/or Ms. McFarland sprayed Mr. Lawson, Ms. Bobadilla and one of the Castillo brothers in the face with what was believed to be pepper spray.

31.    Mr. Lawson and Ms. Bobadilla proceeded a short distance down the driveway before realizing they had been sprayed in the eyes with some sort of harsh chemical.  Upon realizing what happened, Ms. Bobadilla ran back up the driveway and confronted Ms. Ortega and Ms. Wilkins, demanding to know what they had sprayed on her and Mr. Lawson.  Mr. Lawson followed Ms. Bobadilla back up the driveway.  Ms. Ortega and Ms. Wilkins then physically attacked Ms. Bobadilla.

32.    A short distance away, while Ms. Ortega and Ms. Wilkins were assaulting Ms. Bobadilla, Mr. Zoellner and Mr. Lawson began fighting ("Second Altercation").  No witness at the scene or the Preliminary Hearing following Mr. Zoellner's arrest identified any other person involved in the Second Altercation besides Mr. Zoellner and Mr. Lawson.

33.    Paris Wright ("Mr. Wright"), an HSU student, witnessed the Second Altercation.  Mr. Wright is an African American male and a permanent resident of Southern California who, at all times relevant to this Complaint, temporarily resided in Humboldt County solely for the purpose of attending college at HSU.  Mr. Wright was leaving the party around 3:00 a.m. on

April 15, 2017 when he ran into Mr. Lawson at the end of the cul-de-sac after the First Altercation.  He heard Mr. Lawson say something to the effect that he had to go "check on his girl" because Ms. Bobadilla went back to the area in which Ms. Ortega, Ms. Wilkins and Mr. Zoellner were located to find out if they had used pepper spray on her and her friends.  Mr. Wright told Mr. Lawson not to get involved and then proceeded to walk down the street to get into his friend's car when he heard screaming.  When Mr. Wright went back up the driveway in the direction of the screaming, he observed Mr. Lawson and Mr. Zoellner on the ground, and saw that Mr. Lawson had Mr. Zoellner in a headlock.  Mr. Wright rushed over to intervene in an attempt to stop to the Second Altercation.

34.    Upon separating Mr. Zoellner and Mr. Lawson, Mr. Wright immediately noticed that Mr. Lawson had been stabbed.  Mr. Lawson was stabbed multiple times with a ten-inch knife.  Upon seeing Mr. Lawson's stab wounds and the grievous injury done to his friend, Mr. Wright punched Mr. Zoellner in the face.

35.    After the Second Altercation, Ms. McFarland exited the area where the Second Altercation occurred, and headed towards Spear Avenue and called 911.  By this time, other party attendees began calling 911 to report the altercations and a stabbing.  Local news media reported that there were approximately one hundred (100) to one hundred fifty (150) people in attendance at the party that night.

36.    Elijah Chandler ("Mr. Chandler"), a friend of Mr. Lawson's who was also in attendance at the party, immediately ran over to Mr. Lawson after the Second Altercation and found him bleeding and semi-conscious in the bushes under a small tree on the right-hand side of the cul-de-sac.  Mr. Chandler, an African-American male, is a permanent resident of Southern California who, at all times relevant to this Complaint, temporarily resided in Humboldt County solely for purposes of attending college at HSU.  Mr. Chandler reported that he performed cardiopulmonary resuscitation ("CPR") on Mr. Lawson for approximately fifteen (15) minutes before the ambulance arrived.

37.    Ms. Gleaton, one of Ms. Ortega's friends and her companion at the party, corroborated Mr. Chandler's recollection of events at the Preliminary Hearing, and stated that

she was standing next to Ms. Ortega, Mr. Zoellner's girlfriend, while Mr. Chandler was administering CPR to Mr. Lawson.  After Mr. Zoellner was arrested, a preliminary hearing was conducted in May 2017 ("Preliminary Hearing").  At the Preliminary Hearing, Ms. Gleaton testified that she heard Ms. Ortega repeatedly state "I hope that guy dies" while Mr. Chandler was trying to save Mr. Lawson's life.  Several other witnesses testified that they too heard Ms. Ortega state that she hoped that Mr. Lawson would die.  Ms. Gleaton testified that she threatened to "smack" Ms. Ortega if she didn't stop making that statement.

38.     At the Preliminary Hearing, Ms. Gleaton testified further that she retrieved Mr. Zoellner's cellular phone and "keys" from under the tree in front of the house where the Second Altercation occurred after one of the police officers on scene placed Mr. Zoellner in a police vehicle.  Ms. Gleaton testified that she immediately gave Mr. Zoellner's retrieved belongings to Ms. Ortega.

39.     According to Defendant Dokweiler, there were a total of three (3) APD officers on duty around 3:00 a.m. on April 15, 2017 when 911 calls started coming in from attendees of the party.  The 911 calls reported an "altercation/stabbing" in the 1100 block of Spear Avenue in the City of Arcata.  APD Officer Jones arrived on scene with an automated external defibrillator ("AED") for the purpose of providing emergency medical services to Mr. Lawson.  On information and belief, Officer Jones is a person of Caucasian descent.  According to the testimony of Defendant Arminio at the Preliminary Hearing, she watched Officer Jones place the "pads" of the AED on Mr. Lawson's body.  However, after multiple attempts to use the AED on Mr. Lawson, Officer Jones terminated all efforts to continue providing life-saving emergency medical services because the AED was inoperable and not working.

40.     Defendant Losey was one of the first APD officers to arrive at the scene of the Lawson murder on April 15, 2017.  On information and belief, because all APD officers on duty at the time of the murder were low-ranking, Defendant Chapman immediately promoted Defendant Losey to detective before sending him to the murder scene - so that at least one APD officer of detective rank would be present on the ground at the scene.  This was not the standard protocol for promoting an officer to detective rank.

41.     Defendant Losey was not accompanied by a more senior APD officer on the scene of Mr. Lawson's murder until approximately one and a half (1 ½) hours after the stabbing, when Defendant Dokweiler finally arrived.  No APD officer with experience investigating a homicide was present at the scene of Mr. Lawson's murder until the arrival of Defendant Dokweiler.  Defendant Chapman never traveled to the scene of Mr. Lawson's murder on the night it occurred.

42.     Defendant Arminio was the third APD officer to arrive at the scene.  She was employed by the City of Arcata for approximately a year and a half prior to Mr. Lawson's murder.  When she first arrived on scene, there were approximately fifty (50) to one hundred (100) people walking around the area where the incident occurred.

43.     Defendant Arminio testified at the Preliminary Hearing that APD Officers Devon Nilsen ("Nilsen") and Jacob McKenzie ("McKenzie") were already at the Spear Avenue scene when she arrived.  On information and belief, Officers Nilsen and McKenzie are of Caucasian descent.  By the time Defendant Arminio arrived on scene, Officer Nilsen had already detained Mr. Zoellner and placed him the back of his police vehicle.

44.     Defendant Arminio testified that upon arrival to the crime scene, she went directly to Mr. Lawson where he was laying on the ground, face up, next to a tree.  She was able to see Mr. Lawson's stab wounds and allegedly began administering chest compressions.  At some point, according to her testimony under penalty of perjury at the Preliminary Hearing, she stopped administering chest compressions in order to attend to control of the crowd of partygoers milling about the area.  According to her testimony, she stopped administering life-saving chest compressions on at least two separate occasions during the fifteen (15) minute time period it took for the ambulance to arrive on scene.  All of Defendant Arminio's testimony at the Preliminary Hearing in connection with administering chest compressions is a blatant lie.  She never administered chest compressions to Mr. Lawson, according to, including without limitation, Mr. Elijah Chandler and other witnesses at the scene.

45.     Defendants Dokweiler and Losey failed to instruct the APD or any other officers at the scene of Mr. Lawson's murder to secure the area for purposes of evidence preservation and

failed to take immediate steps to secure the scene themselves.  Although Mr. Lawson was stabbed at approximately 3:00 a.m., and APD officers began arriving on scene shortly thereafter, no perimeter was set up around the scene to restrict civilian access until approximately 7:00 or 8:00 a.m. that morning.  Moreover, when APD officers finally taped off the scene several hours after arriving on scene, the cordoned-off area did not include the location where the fatal stabbing took place and instead encompassed only the location where Mr. Lawson finally collapsed from the severity of his injuries.

46.     Upon information and belief, APD received a medical aid call from the scene of Mr. Lawson's murder around 3:05 a.m. on April 15, 2017.  According to Arcata Fire Department Chief Justin McDonald ("Chief McDonald"), there was a delay in notification because medical response calls were channeled through the Cal Fire dispatch center prior to being redirected to local crews.  Typically, when there is a call for medical aid to a potentially violent scene in the City of Arcata, it is standard practice and custom for first responders to "stage" near the scene until getting word from police that the scene is safe to enter.  According to Defendant Chapman, Chief McDonald and Arcata Ambulance CEO Doug Boileau ("Mr. Boileau"), the call for medical aid was made within four (4) minutes of the first APD officer's arrival on the scene.

47.     At approximately 3:07 a.m. on April 15, 2017, Arcata Ambulance, located at 220 F Street in the City of Arcata, received a call through Cal Fire dispatch to respond to the scene of the Lawson murder.  At the same time, an Arcata Fire Department crew with two (2) cross-trained emergency medical technicians departed for the scene from their station on Janes Road near Mad River Community Hospital in the City of Arcata.

48.     One minute after receiving the dispatch from Cal Fire, Arcata Ambulance was en route to the 1100 block of Spear Avenue.  Mr. Boileau stated that it was approximately 3.3 miles from the station to the scene.  Seven (7) minutes after the initial 911 call – at approximately 3:09 a.m. – an Arcata Fire Department crew arrived on scene.  According to Chief McDonald, a bystander – not an APD police officer - waved the fire crew over to the scene when they arrived.

49.     According to Defendant Chapman, two (2) APD officers were administering CPR to Mr. Lawson when the fire crew arrived.  This is a blatant lie, and the first of many deliberate

and knowing falsehoods told by Defendant Chapman about the events occurring on the night of Mr. Lawson's murder.

50.     Upon arrival at the scene, one of the emergency medical technicians ("EMT") from the Arcata Fire Department decided to move Mr. Lawson's body in order to provide medical care.  Mr. Chandler – among many other witnesses – watched in shock as the EMTs grabbed Mr. Lawson's body by his left leg and left arm and dragged him roughly from underneath the bushes where he collapsed after being stabbed.  Mr. McDonald admitted to reporters that Mr. Chandler's description of the dragging of Mr. Lawson's body was accurate. The act of dragging Mr. Lawson's body was so egregious that observing witnesses began to make comments to the emergency personnel on site, objecting to their rough handling of the severely injured Mr. Lawson.

51.     At 3:15 a.m., approximately fifteen (15) minutes after the first 911 calls, an ambulance arrived on scene.  At 3:21 a.m., the ambulance departed for Mad River Community Hospital.  When he arrived at the hospital, Mr. Lawson still had a heartbeat and paramedics were maintaining his respiration through CPR.  Mr. Lawson was immediately rushed into surgery, and at 4:07 a.m., he was pronounced dead.

52.     On the night of Mr. Lawson's murder, some – but not all – of the four women involved in the First and Second Altercations (Ms. Ortega, Ms. McFarland, Ms. Wilkins, and Ms. Gleaton) were brought to the Arcata Police Department.  On information and belief, all but one of the women were allowed to leave without being interviewed at the station.  The other three women were later interviewed at their respective homes.

53.     While all four women were eventually fingerprinted, the interviewing officers at the Arcata Police Department took no physical evidence from Ms. Ortega, Ms. McFarland, Ms. Gleaton or Ms. Wilkins at the time of Mr. Lawson's murder.  The APD failed to obtain any of the clothing the four women were wearing the night of the murder, and failed to obtain DNA samples from the four women for comparison against deconvoluted DNA or touch DNA analysis until more than one (1) year after Mr. Lawson's murder.

54.     Officer McKenzie (an APD officer with less than one (1) year of experience) and HSU Police Officer Billy Kijsriopas were in charge of securing the scene of the Lawson murder. On information and belief, both Officer McKenzie and Officer Kijsriopas are of Caucasian descent.  Officers McKenzie and Kijsriopas allegedly remained in the cul-de-sac area off Spear Street that night for the specific purpose of securing the scene after the ambulance left for the hospital.  However, no portion of the Lawson crime scene was cordoned-off and secured until approximately three (3) to four (4) hours after the fatal stabbing took place, and the area ultimately cordoned-off by police later that morning did not include the location where the stabbing occurred.  In addition, Officer McKenzie and Officer Kijsriopas failed to secure Mr. Zoellner's vehicle at the scene of Mr. Lawson's murder.  Instead, they allowed Ms. Ortega and Ms. McFarland's parents to drive the vehicle away from the scene with the bag of knives inside the vehicle had even been searched, much less processed for evidence.

55.     Once Ms. Ortega and Ms. McFarland's parents drove Mr. Zoellner's vehicle back to Mr. Zoellner and Ms. Ortega's apartment, Ms. Ortega removed the bag of knives from Mr. Zoellner's vehicle and brought it inside their apartment.

56.     During their first search of Mr. Zoellner and Ms. Ortega's apartment, several days after Mr. Lawson's murder, APD officers (led by Defendants Chapman and Dokweiler) failed to collect and book into evidence the bag of knives Mr. Zoellner had in his vehicle the night of Mr. Lawson's murder.

57.     When the APD eventually obtained a second search warrant and went back to the Mr. Zoellner and Ms. Ortega's apartment to collect that bag of knives, one of the knife slots was empty and the knife from that compartment was missing.  The knife bag also contained another large compartment that could hold several ten-inch knives.  That compartment was empty by the time the APD finally took possession of Mr. Zoellner's knife bag.

58.     At the scene of Mr. Lawson's murder, Officer McKenzie located a large knife underneath a red Mustang parked in the cul-de-sac and retrieved the knife from beneath the car. Officer McKenzie had only one (1) glove with him when he arrived at the scene and could not

recall upon later questioning whether or not he was wearing that glove when he picked up the knife.  That knife was later determined by the APD to be the murder weapon.

59.     At the Preliminary Hearing, Officer McKenzie testified, *inter alia*, to the following: 1) he did not have a flashlight with him when he arrived at the scene in the dark hour of 3:00 a.m. on April 15, 2017, 2) he failed to check Mr. Lawson's vital signs when he saw him bleeding profusely in front of the house where the party had taken place, 3) there were only ten to fifteen people standing around Mr. Lawson when he first encountered him, and that these potential witnesses were not hostile to him when he arrived on scene, 4) he put pressure on Mr. Lawson's stab wounds for about ten (10) to fifteen (15) minutes before an ambulance arrived, 5) he witnessed one of the persons at the scene provide CPR and mouth-to-mouth resuscitation to Mr. Lawson, and no APD officer at the scene assisted that individual or directed him to stop engaging in such CPR activity, 6) another potential witness was trying to move the crowd back from Mr. Lawson in order to make room for those persons trying to save Mr. Lawson's life, 7) after Mr. Lawson was taken by ambulance to the hospital, Officer McKenzie went back to his patrol vehicle to get his camera so that he could photograph the scene, 8) when he got back to his patrol vehicle, he was approached by Ms. McFarland, and refused her attempt to give him her statement of the events that occurred that evening, 9) he placed the murder weapon in a manila envelope after discovering it under a Ford Mustang parked next to the area where Mr. Lawson collapsed from his stab wounds, 10) sometime after taking photographs of the crime scene, Officer McKenzie went back to his patrol vehicle and obtained crime scene tape and taped off the crime scene area, 11) he started a crime scene log after he taped off the crime scene area, 12) he interviewed a resident in a neighboring house at 1112 Spear Avenue, but not any of the other 50 to 100 potential witnesses who were at the scene upon his arrival, and 13) he did not try to stop any potential witnesses from leaving the scene of Mr. Lawson's murder and is not aware of any other APD officers making any attempts to stop potential witnesses from leaving the scene or to gather the names and contact information of those potential witnesses before they left.

60.     At some point in the early morning hours of April 15, 2017, one (1) APD officer left the scene and went to Mad River Community Hospital to check on Mr. Lawson's condition,

while another APD officer took Mr. Zoellner into custody and escorted him to the Arcata police station.  It was the policy and custom of the Arcata Police Department that the Chief of Police visit the scene of homicide cases.  Defendant Chapman never went to the scene of the murder on the day it occurred, even though murders are rare in the City of Arcata.

61.     APD officers at the scene of the Lawson murder, including but not limited to Defendants Losey and Dokweiler, dispersed the attendees of the party – and prospective witnesses to the murder – without first attempting to obtain the attendees' names or contact information.  More than one (1) year after Mr. Lawson was murdered, the APD (specifically, Defendants Chapman and Dokweiler) stated that the investigators on the case had only interviewed approximately thirty percent (30%) of the attendees at the party that night and had not identified and/or contacted the remaining seventy percent (70%) of potential witnesses.  This is another blatant lie.  At no relevant time did APD interview fifteen (15) to thirty (30) party attendees about the events that occurred on April 15, 2017.

62.     Defendant Dokweiler admitted that the crime scene should have been secured and witnesses prevented from leaving the scene once APD officers arrived.  Instead of taping off the entire cul-de-sac where the First and Second Altercations took place, APD officers only cordoned off a small area encompassing a portion of the street where a trail of Mr. Lawson's blood was found, the bushes where Mr. Lawson collapsed across the street from the house party, and the red Mustang underneath which the murder weapon was found.  The area where Mr. Lawson was fatally stabbed that night was not cordoned off or otherwise secured by the APD or any other investigating agency.  Defendant Dokweiler admitted that the APD should have taped off the entire cul-de-sac and the grassy area where the fatal stabbing likely occurred to better preserve the scene, and should have prevented party attendees from leaving the scene without first providing their names and contact information to APD officers.

63.     It is local custom, policy and practice for local law enforcement agencies, including the APD, to immediately notify the Humboldt County District Attorney's Office Chief Investigator of the occurrence of a homicide within the jurisdiction of the Humboldt County District Attorney.  However, at no time during the night of Mr. Lawson's murder – or at any time

thereafter – did Defendant Chapman or any other APD officer contact the Humboldt County District Attorney's Office to inform them of or to request assistance in investigating Mr. Lawson's murder.  Instead, Humboldt County District Attorney's Office Chief Investigator Wayne Cox ("Mr. Cox") read about Mr. Lawson's murder in the local media and contacted Defendant Chapman to offer his assistance.  Defendant Chapman refused Mr. Cox's offer of assistance with the Lawson murder investigation.

64.     A few days after Mr. Lawson's murder, City of Arcata Vice Mayor Sofia Pereira made a lengthy public statement regarding his death at the Arcata City Council's regularly scheduled April 2017 meeting.  In part, Ms. Pereira stated that:

> We cannot continue to ignore the systematic and cultural racism that exists in our community.  While we can say we've been working on issues of equity in our community, as a community, we have failed Josiah.  And we failed other students of color who have stated over and over again that they do not feel safe or welcome here [in Arcata].  I heard first-hand the fear that students of color have about local racism and for their safety off-campus; they know and we know that racial inequities continue to exist. The students expressed concerns that I share, that race played a role in the homicide.

Ms. Pereira also recounted HSU students' expressed concerns over the response time and priorities of first responders who arrived at the scene of Mr. Lawson's murder.

65.     Defendant Losey lied to Ms. Bobadilla by representing to her that assault charges had been filed against Ms. Ortega, Ms. McFarland and Ms. Wilkins approximately one (1) or two (2) months after Mr. Lawson's murder, but that neither the supervising APD Sergeant (Defendant Dokweiler) or Humboldt County District Attorney Maggie Fleming ("Ms. Fleming") had signed off on those charges.  APD officers actively discouraged Ms. Bobadilla from filing charges against Ms. Ortega, Ms. McFarland and Ms. Wilkins in connection with their brutal assault on her person.  Ms. Bobadilla is of African-American and Latinx descent.  In fact, APD officers did not even interview Ms. Bobadilla until approximately one (1) week after Mr. Lawson's murder.  To date, the APD has failed to investigate the violent assault on Ms. Bobadilla by Ms. Ortega and Ms. Wilkins.  Consequently, no charges were ever filed (contrary to the lies told to Ms. Bobadilla by Defendant Losey) against Ms. Ortega or Ms. Wilkins for their violent assault against Ms. Bobadilla.

SECOND AMENDED COMPLAINT

MICHELLE CHARMAINE LAWSON v. CITY OF ARCATA *et al.*

66.     Under the direction of Defendant Chapman, only two (2) APD officers were assigned to the investigation of Mr. Lawson's murder: Defendant Dokweiler and Defendant Losey.  On information and belief, Defendant Losey was an inexperienced police officer with less than one (1) year of experience as an officer at the time of that assignment, and was promoted to detective specifically for the purpose of responding to the scene of Mr. Lawson's murder.  Defendant Losey had no prior homicide investigation experience before being assigned to the Lawson murder investigation.  Astonishingly, Defendant Losey was the senior APD officer on scene the night of Mr. Lawson's murder for the first hour and a half after the stabbing took place.

67.     Defendant Losey alienated many of the potential witnesses at the scene on the night of the murder by behaving in a hostile, insensitive and intimidating manner when communicating with prospective witnesses.  Once Mr. Zoellner was taken into custody in connection with the murder of Mr. Lawson, Defendant Losey informed Kenya James ("Ms. James"), Interim Coordinator of HSU's African American Center for Academic Excellence, that he would have the case against Mr. Zoellner dismissed as self-defense if witnesses (e.g., her students) did not come forward with more evidence.  Ms. James is an African-American female. Defendant Losey resigned from the APD in early August 2017, and the APD chose not to fill the vacancy his departure caused in the Lawson homicide investigative team for more than eight (8) months after his resignation.

68.     Mr. Zoellner was taken into custody by APD officers the night of Mr. Lawson's homicide, and was eventually charged with the murder of Mr. Lawson.  A Preliminary Hearing was held for Mr. Zoellner in or about early May 2017.  At the end of the Preliminary Hearing, Humboldt County Superior Court Judge Dale Reinholtsen dismissed the charges against Mr. Zoellner for lack of sufficient evidence.  In his ruling, Judge Reinholtsen specifically stated that there was a lack of testimony from an autopsy surgeon, no evidence related to blood analysis, no proof that the knife found at the scene was the one which caused lethal injury to Mr. Lawson, lack of evidence related to the ownership of the knife found at the scene, lack of proof regarding the fibers and fingerprints found on that knife, and no showing or explanation as to how Ms.

Bobadilla ended up with injuries to her left forearm which looked like someone had jabbed her with a sharp object.

69.     On or about May 5, 2017, Plaintiff organized the first of many peaceful protests in Arcata, CA to demand "Justice for Josiah."  On or about May 9, 2017, Plaintiff organized a "walk out" of the Humboldt State University faculty, staff and students to show solidarity to end racism, homophobia, xenophobia, transphobia, and gender and economic discrimination in the name of "Justice for Josiah." On or about May 10, 2017, Plaintiff made a comment on social media stating that, "Black lives cannot matter so long as non-black people have the power to use Black bodies as scapegoats." On or about May 20, 2017, Plaintiff organized a protest at the Humboldt County courthouse demanding "Justice for Josiah."

70.     On or about May 8, 2017, Defendant Chapman attended a radio town hall on KSHU for the alleged purpose of clearing up misinformation about the case.  During this radio town hall, Defendant Chapman stated that outside investigators were assisting the APD, and that he had personally met with agents from the FBI to discuss resources.  In addition, he publicly stated that APD was working with the California Department of Justice, as well as the Humboldt County Police Department.  This was a blatant lie.  Defendant Chapman lied to the public in a town hall that was organized for the specific purpose of clearing up misinformation about the case.

71.     On or about May 20, 2017, the City of Arcata's mayor – Susan Ornelas – was quoted in a news article stating that she would personally contact the California Department of Justice to request their involvement.  This statement was made almost two weeks after Defendant Chapman claimed that the California Department of Justice was already working with APD on the investigation of Mr. Lawson's murder.  On this same day, the website www.justiceforjosiahlawson.com went live.  Around this time, Plaintiff made the first of a series of public statements – some made at regularly scheduled Arcata City Council meetings, and others made to the media – criticizing the APD, Defendants Chapman and Dokweiler, and the City of Arcata for failing to conduct a thorough and timely investigation into her son's murder. In those statements, Plaintiff openly questioned Defendants' commitment to solving the case,

SECOND AMENDED COMPLAINT

MICHELLE CHARMAINE LAWSON v. CITY OF ARCATA *et al.*

criticized their lack of diligence and failure to devote sufficient resources to the investigation, and suggested that Defendants were unmotivated to solve her son's murder because he was African-American.

72.   On May 21, 2017, Defendant Chapman attended a press conference with Plaintiff standing to his immediate right.  In a very emotional plea to the community for help, she described in detail the sequence of events on the night she found out that her first born son had been murdered.  Defendant Chapman watched and listened to the Plaintiff wail and moan in pain while he continued to spew lies about the murder investigation of her son.

73.   On or about May 29, 2017, a local business owner in Arcata, CA plowed his truck through a group of peaceful "Justice for Josiah" student and community protesters.  The Arcata police department never investigated this person or made any arrests, despite the fact that they knew his identity.

74.   On or around June 6, 2017, Nazy Javid - a local ABC news reporter – interviewed Plaintiff and asked her questions about the investigation.  Plaintiff expressed her disappointment with the investigation and began criticizing the APD. During this news report, Mayor Susan Ornelas admitted that the APD and the City needed help, and that she would be reaching out to outside law enforcement agencies for assistance.  She made this statement approximately one month after Defendant Chapman claimed that outside law enforcement agencies, including the FBI and California Department of Justice, were already involved in the investigation.  That same day, a petition on www.Change.org was created to "Bring in the California Department of Justice to investigate the murder of David Josiah Lawson."  The petition summary states, in part: "There has been serious allegations of police incompetence and overall negligence on behalf of Arcata Police Department."  This petition received two thousand seven hundred two (2,702) supporters.

75.   On or around June 7, 2017, Defendant Chapman expressly stated at the Arcata City Council Meeting that two outside investigators had been brought in to assist with the investigation, but refused to provide the public with their names or agency affiliation.  Defendant Diemer was also present at this meeting and made statements in support of the lies told by

SECOND AMENDED COMPLAINT

MICHELLE CHARMAINE LAWSON v. CITY OF ARCATA *et al.*

Defendant Chapman.  He also stated that the California Department of Justice had been active in the investigation "since day one." This was another obvious lie in light of the fact that the City's mayor publicly stated in May 2017 that she would request the participation of the California Department of Justice because the APD was ill equipped to handle the investigation.  There were no outside law enforcement agencies assisting Defendant Chapman or his team in June 2017 – or anytime thereafter.

76.     On or about June 13, 2017, Plaintiff contacted Defendant Chapman to get an update on the murder investigation.  Plaintiff was informed that Defendant Chapman was out of town, so she contacted Chief Andrew Mills ("Chief Mills") at the Eureka Police Department ("EPD") to get an update on the investigation.  Plaintiff contacted Chief Mills because Defendant Chapman told her that he was actively involved in her son's murder investigation. Plaintiff discovered that Defendant Chapman was lying to her about the investigation after she contacted Chief Mills and asked about the EPD's involvement in the investigation of her son's murder. In response to that inquiry, Chief Mills informed Plaintiff that the EPD was not involved with Mr. Lawson's murder investigation, and that the APD had refused all offers of assistance from him and his department.

77.     Beginning on or around April 2017, Chief Mills made a series of offers to Defendant Chapman to supply him with the EPD's two best investigators to assist with the Lawson murder investigation.  Defendant Chapman repeatedly refused these offers of assistance from Chief Mills.  Chief Mills also offered to obtain assistance from his former homicide partner in the San Diego Police Department if Defendant Chapman was willing to formally request such assistance.  Defendant Chapman also refused that offer of assistance from Chief Mills.

78.     Humboldt State University Police Chief Donn Peterson ("Mr. Peterson") also offered his department's assistance to Defendant Chapman with the investigation of Mr. Lawson's murder.  Defendant Chapman refused Mr. Peterson's offer of assistance.

79.     Humboldt County Sheriff Billy Honsal ("Mr. Honsal") also offered Defendant Chapman his department's assistance in the Lawson murder investigation.  Defendant Chapman refused Mr. Honsal's offer of assistance.

80.     On June 15, 2017 – and for every month up to present day – a vigil has been organized for Mr. Lawson in the Arcata Plaza, located in the center of town.  Plaintiff has attended almost every vigil – traveling from southern California to Humboldt County in order to keep the police investigators honest and obtain justice for her son.

81.     On or about June 18, 2017, the local NAACP chapter in Humboldt County asked local media to monitor hate speech on their social media platforms regarding the David Josiah Lawson murder investigation.  The comments made online were so egregious, that the local NAACP chapter felt compelled to take action.  Neither the City nor APD took steps to curb the misinformation about the case, which contributed to the heightened racial tension in the community.

82.     On or about June 22, 2017, an article was published on www.sfbayview.com, (originally published in the Mad River Union publication - a local news provider), which reported that the probable cause notes submitted by Defendant Dokweiler stated that Mr. Zoellner took part in the fight that allegedly led to the sophomore student's death.  Defendant Dokweiler also wrote in his notes that numerous witnesses had detained Zoellner and indicated that he stabbed the victim.  Defendants knew at all relevant times that Mr. Kyle Zoellner was the perpetrator of this fatal crime – and yet they failed to take the reasonable and necessary steps to bring this person to justice.

83.     On or about June 2017, at a regular meeting of the Arcata City Council, Defendants Chapman and Diemer made representations to Plaintiff and the public that a team of law enforcement officers from agencies across the county, including the Eureka Police Department, HSU Police Department, and the Humboldt County Sheriff's Office, were assisting in the investigation of Mr. Lawson's murder, and were holding weekly meetings to review progress in the investigation.  This was a blatant lie and a deliberate and intentional misrepresentation of the facts.  In reality, the Eureka Police Department conducted processing of just one (1) potential fingerprint, and the Eureka Police Department along with Humboldt County Sheriff's Office participated in a single brief "case review" meeting in connection with Mr. Lawson's murder.  At that "case review" meeting, the only information received by the

outside agencies attending was contained in a summary PowerPoint slide presentation created by the APD.  The APD did not share its case file for the Lawson murder investigation with any of these outside agencies.  Aside from that single meeting and analysis of a single fingerprint, the Eureka Police Department and the Humboldt County Sheriff's Office were not involved in the investigation of Mr. Lawson's murder.  The APD never shared any police reports or evidence related to the Lawson murder with any outside agency.  Defendant Chapman intentionally misled Plaintiff about the investigation of her son's murder by representing that outside agencies were assisting the APD with their investigation, and that the APD was taking advantage of all resources available to assist with the investigation of her son's murder.

84.     On or about June 30, 2017, Plaintiff organized a press conference where many City officials were present, including Defendant Chapman.  During the press conference, while standing right next to Plaintiff, Defendant Chapman stated that the "DOJ" was taking charge of analyzing the evidence in Mr. Lawson's murder investigation.  This was another unmistakable lie.

85.     During the summer months of 2017, Defendant Chapman told Plaintiff and her family on several occasions that the San Jose Police Department had homicide investigators reviewing the Lawson murder case with the APD.  In fact, the San Jose Police Department never agreed to assist in the investigation and never provided the APD with any assistance in the Lawson murder investigation.  Defendant Chapman knowingly and blatantly lied to Plaintiff regarding the resources being brought to bear and investigative steps being taken in an effort to solve her son's murder.

86.     On or about August 2017 (approximately four (4) months after Mr. Lawson's murder), the APD received initial returns on DNA evidence collected in connection with Mr. Lawson's murder, and represented that they would be sending evidence back to the forensics laboratory for further analysis.  The initial DNA returns only provided information related to major DNA contributors on the items submitted for testing.  The request for further DNA analysis would focus on minor DNA contributors on the knife determined to be the murder weapon using deconvoluted DNA analysis and touch DNA testing.

87.     Initial DNA testing results showed that Mr. Zoellner and Mr. Lawson were the two primary DNA contributors of the blood evidence submitted to the laboratory, including the blood found on the murder weapon itself.  On information and belief, fiber evidence collected at the scene has been preliminarily analyzed and determined to be synthetic, but no further testing of that fiber evidence has been conducted, and there may be nothing to compare it against since no clothing was collected by the APD from Mr. Zoellner, Ms. Ortega, Ms. Wilkins, Ms. McFarland, or Ms. Gleaton.  On information and belief, nail clippings and fingernail scrapings were collected from Mr. Lawson's body, but the APD never submitted that evidence for forensic testing or analysis, although representations to the contrary were made to Plaintiff.

88.     On or about August 2017, the APD was notified by counsel for the Lawson family that HSU student Ashlyn Gardenhire, an attendee at the party where Mr. Lawson was killed, had taken and preserved several video recordings of the party taken the night of the murder, including at least one video depicting Ms. Wilkins at the party.  Ms. Gardenhire is an African-American female who graduated from HSU in 2019, and a permanent resident of Southern California.  As of the date of this Complaint, the APD still has not obtained those video recordings, nor has it interviewed Ms. Gardenhire.

89.     Until Interim Chief Richard Ehle was retained by the APD several months after Defendant Chapman's abrupt resignation in early April 2018, the APD refused to re-interview any of the suspects and/or persons of interest in Mr. Lawson's murder following their initial interview, including without limitation Mr. Zoellner, Ms. Ortega, Ms. McFarland and Ms. Wilkins.  Ms. McFarland repeatedly contacted the APD for the specific purpose of talking to an investigator about Mr. Lawson's murder, but the APD merely rebuffed her attempts to speak with an investigator and ignored her.

90.     Mr. Lawson's autopsy was conducted by Dr. Mark Super, a pathologist in Fairfield, California hired on a contract basis by the City.  Autopsies usually take two (2) to four (4) hours to perform.  Ordinarily, preliminary results can be released within twenty-four (24) hours, but the full results of an autopsy may take up to six (6) weeks to prepare.  The autopsy report for Mr. Lawson, by contrast, took Dr. Super nearly eleven (11) months to complete,

despite the fact that Officer Nilsen testified at the Preliminary Hearing that he attended the autopsy of Mr. Lawson and that Dr. Super told him then that the preliminary cause of death was a stab wound to the chest.

91.    The APD failed to analyze the contents of Mr. Lawson's cell phone, Ms. Bobadilla's cell phone, Mr. Zoellner's cell phone, or a number of computers owned by Mr. Zoellner until approximately eighteen (18) months after Mr. Lawson's murder, and on information and belief, at least some of that analysis still has not yet been completed as of the date of this Complaint.  The APD also failed to interview at least one of Mr. Lawson's housemates who also attended the party with Mr. Lawson, to see what information – if any - that she could provide about Mr. Lawson's murder.

92.    The APD failed to investigate the origin of the knife determined to be the murder weapon. The APD quickly concluded that the Henkel brand knife found at the scene did not match any of the knives in the house where the party took place, or any of the knives in Mr. Zoellner's knife bag.  Although at least one APD officer visited the catering kitchen where Mr. Zoellner worked several days after the Lawson murder, and observed a box of knives sitting on a countertop – knives that included several manufactured by Henkel – that box of knives was not collected, and the APD never formally searched, executed a search warrant at, or collected evidence from the catering kitchen.  On information and belief, that catering kitchen contained dozens of additional chef knives that were available to Mr. Zoellner at the time of Mr. Lawson's murder – including Henkel brand knives -- with no control mechanism for determining whether, when or by whom particular knives had been taken off the premises.

93.    On or about October 2017, the Lawson family attorney offered the APD the *pro bono* assistance of former Assistant Special Agent in charge of the Federal Bureau of Investigation's ("FBI") Los Angeles bureau, Thomas Parker ("Mr. Parker"), to help in the investigation of Mr. Lawson's murder.  The APD initially accepted Mr. Parker's assistance.

94.    Mr. Parker invested approximately two hundred (200) pro bono hours investigating Mr. Lawson's murder, traveling from his home in Santa Barbara, California to Arcata, California approximately once a month over an eight-month period to meet with APD

SECOND AMENDED COMPLAINT

MICHELLE CHARMAINE LAWSON v. CITY OF ARCATA *et al.*

officers, including Defendants Chapman, Dokweiler and Losey, and to interview witnesses connected to the case.

95.     On or about November 2017, after he reviewed the APD's file in this case and conducted dozens of hours of investigation himself, Mr. Parker delivered to the APD a written report with detailed forensic and investigative recommendations for the Lawson homicide case. Among other things, Mr. Parker recommended that a serology expert be retained to test what appears to be a bloody knife swipe on Mr. Zoellner's pants, and that metallurgy tests be conducted to compare the sharpening striations on the murder weapon with sharpening striations on the knives collected from Mr. Zoellner's apartment and the knives from the catering kitchen where he worked.  Mr. Parker also offered to arrange to have the Lawson murder investigation evidence submitted to an FBI forensic testing lab for faster processing, but Defendants repeatedly rebuffed and refused those offers.

96.     The APD failed to sufficiently investigate the origin of the murder weapon – a Henkel brand chef's knife.  The APD made no effort to obtain the Henkel brand knives in the catering kitchen where Mr. Zoellner worked, even after Mr. Parker recommended that the APD collect those knives and submit them for comparison metallurgy testing along with the murder weapon for the purpose of determining whether or not the knives in the catering kitchen had identical sharpening tool marks as the murder weapon.  The catering kitchen where Mr. Zoellner worked at the time of Mr. Lawson's murder has since been shut down, thereby destroying any opportunity to collect those knives.

97.     On information and belief, the APD has not followed up on the bulk of the recommendations contained in Mr. Parker's report.  Several months after Mr. Parker provided the APD with his written report and recommendations, he requested that they respond in writing with an update on the progress made on his recommendations.  No such update was ever provided to Mr. Parker.  Mr. Parker followed up on the recommendations he provided to the APD with Defendant Chapman, who falsely assured Mr. Parker that the APD was working on pursuing his recommendations, and untruthfully represented to Mr. Parker that he had contacted the FBI and that the FBI had agreed to provide the APD with assistance with witness interviews.

As a result of his lengthy history with the FBI, Mr. Parker immediately knew that Defendant Chapman's representation was a lie, and that Defendant Chapman had likely contacted the FBI as recommended.

98.     Due to the APD's unwillingness to act on his investigative recommendations, lack of candor with him, and apparent lack of interest in moving the case forward, Mr. Parker resigned from his contract with the City of Arcata in or around early April 2018.  The next morning, Defendant Chapman abruptly resigned from his position as Chief of Police for the City of Arcata without further explanation.

99.     On information and belief, the APD has failed to submit personal effects found on Mr. Lawson's body (including his watch) for forensic testing, and has failed to submit Mr. Lawson's nail clippings and scrapings from under his fingernails to any laboratory for forensic analysis.

100.    Despite the foregoing failures to investigate, Defendants Chapman and Dokweiler made representations to Plaintiff on multiple occasions that all local resources had to be exhausted before the APD could seek outside assistance from the California Department of Justice ("DOJ") or other law enforcement agencies in connection with the Lawson investigation. Defendants Chapman and Dokweiler failed to request such assistance from the DOJ or from any other outside law enforcement agency, despite their express representations to Plaintiff to the contrary.

101.    The City of Arcata issued several press releases informing the public that the APD had received additional investigative recommendations from Mr. Parker and were in the process of following those recommendations.  In reality, at the time those press releases were issued, neither the City of Arcata nor the APD had followed up on or pursued any of Mr. Parker's recommendations.  The press releases issued by the City to this effect were deliberately false and untruthful, and issued for the sole purpose of deceiving Plaintiff and the public about the status of the investigation into Mr. Lawson's murder, and attempting to quell public concern that the investigation was stalled and essentially at a standstill.

102.    Prior to Defendant Chapman's resignation as Defendant City's Chief of Police, Defendant Diemer asked Defendant Chapman to provide her with recommendations for a third-party entity that could be retained to review and provide recommendations regarding the APD's response to the scene of Mr. Lawson's murder and subsequent investigation of that homicide.  In response to Defendant Diemer's request, Defendant Chapman supplied her with the names of three (3) such third-party entities, all of which were operated principally by current or former law enforcement officers with whom Defendant Chapman already was acquainted and had previously worked with in the past.  Defendant Chapman further disclosed to Defendant Diemer, along with these recommendations, the personal relationships he had and maintained with the principals of those third-party entities.  Rather than asking Defendant Chapman for an alternate recommendation for a neutral third-party investigative entity with whom he had no personal connections, seeking such a recommendation from anyone else, or attempting to identify such a neutral entity herself, Defendant Diemer instead followed Defendant Chapman's admitted self-interested recommendation and retained the National Police Foundation to perform that investigation.  One (1) of the two (2) investigators assigned by the National Police Foundation to review the APD's response to the Lawson homicide is a former police chief who served for a number of years alongside Defendant Chapman on the Board of Directors of the California Police Chiefs Association.  To date, the National Police Foundation has failed to publish its report on the APD's response to the Lawson murder, despite the fact that representations were made that the report would be complete and published on its website around the beginning of 2019.

103.    As of the date of this Complaint, the APD has continued to deny Plaintiff access to any and all police reports related to her son's murder, as well as her son's autopsy report. From May 2017 to July 2018, APD and the City of Arcata refused to release the transcript of Mr. Zoellner's Preliminary Hearing to Ms. Lawson.

104.    On or about March 27, 2019 – nearly two (2) years after Mr. Lawson was murdered, Defendants publicly released still footage of young male persons of color who attended the April 2017 party where Mr. Lawson was slain, taken from police dashboard camera

footage in the APD's sole custody and possession since the night of Mr. Lawson's murder. Defendants released this footage to the public more than two (2) years after it was taken with the intent and design of promoting the knowingly false implication that the young African-American and Latinx male college students who appear in those photos are or may be potential suspects in Mr. Lawson's murder, instead of innocent bystanders whom Defendants deliberately allowed to leave the scene of the crime on the night of Mr. Lawson's murder without first obtaining their names or contact information where they could be reached.

105.   As of the date of this Complaint, no other person has been charged with the murder of David Josiah Lawson since charges against Mr. Zoellner were dismissed in or around May 2017.  The APD and the Humboldt County District Attorney's Office, as of the date of this writing, have failed to file any additional charges against Mr. Zoellner or anyone else in connection with Mr. Lawson's murder.  Today, the murder of David Josiah Lawson remains the only unsolved murder in the City of Arcata.

106.   On information and belief, the majority of murder victims in Defendant City within the last ten (10) years have been both Caucasian and native, longtime and/or permanent residents of Humboldt County.  In each of those murder investigations, except for Mr. Lawson's, a suspect was promptly identified and charged by the APD and charges successfully prosecuted against (or a plea deal accepted by) the identified perpetrator, except for instances in which the victim's death was caused by the APD itself, in which no charges were ever filed.

107.   On or about May 9, 2015, APD officers responded to the scene of the Arcata homicide of Trevor Mark Harrison ("Mr. Harrison"), a Caucasian male and a permanent resident of Humboldt County and Defendant City.  APD officers arrested one suspect in Mr. Harrison's homicide in Samoa, California on or about May 10, 2015, a second suspect in Blue Lake, California on May 12, 2015, and the third and final suspect in Loleta, California on May 13, 2015.  On information and belief, responding APD officers followed proper police protocol in investigating this homicide, dispatched experienced and senior homicide investigators to respond immediately to the scene, promptly secured the crime scene and its perimeter, promptly identified and interviewed relevant witnesses, and otherwise executed their investigative duties

SECOND AMENDED COMPLAINT

MICHELLE CHARMAINE LAWSON v. CITY OF ARCATA *et al.*

with appropriate thoroughness, urgency and care.  All three suspects were promptly charged with Mr. Harrison's murder, and on information and belief, all three suspects were either successfully prosecuted for that crime or accepted a plea bargain from prosecuting authorities.

108.    On or about August 27, 2016, APD officers responded to the scene of the Arcata homicide of Gigi Misztal, a Caucasian infant female and a native, permanent resident of Humboldt County.  The infant's mother was arrested for her murder the same day and was promptly charged and ultimately prosecuted for her daughter's homicide.  On information and belief, responding APD officers followed proper police protocol in investigating this homicide, dispatched experienced and senior homicide investigators to respond immediately to the scene, promptly secured the crime scene and its perimeter, promptly identified and interviewed relevant witnesses, and otherwise executed their investigative duties with appropriate thoroughness, urgency and care.

109.    On or about September 4, 2016, APD officers responded to the scene of the Arcata homicide of Alan Gradwohl, a 55-year-old Caucasian male and longtime permanent resident of Defendant City who was struck and killed in a pedestrian crosswalk at the intersection of 14th and H Streets by a drunk hit-and-run driver.  On information and belief, responding APD officers followed proper police protocol in investigating this homicide, dispatched experienced and senior homicide investigators to respond immediately to the scene, promptly secured the crime scene and its perimeter, promptly located and immediately secured relevant physical evidence (including a vehicle), promptly identified and interviewed relevant witnesses, and otherwise executed their investigative duties with appropriate thoroughness, urgency and care.  APD officers promptly identified and arrested the intoxicated suspect later the same day, after locating and seizing the suspect's vehicle parked on H Street.  The suspect in Mr. Gradwohl's homicide was promptly charged, and later pled guilty to charges of vehicular manslaughter.  Mr. Gradwohl's homicide was the last in Defendant City before the murder of Mr. Lawson in April 2017.

110.    In the only other homicide in Defendant City in 2017, Ervin Eugene Sweat, Jr. ("Mr. Sweat") of Antioch, Tennessee was killed by nine (9) gunshots fired by APD and HSU

officers during a confrontation near the downtown Arcata Plaza.  Mr. Sweat was a young African-American male who was only visiting and did not reside in Humboldt County.  No charges were ever filed against any person in connection with the death of Mr. Sweat.

111.    In or around May 2019, APD officers responded to the scene of an Arcata homicide near the intersection of Foster Avenue and Alliance Road, less than a mile from the scene of the Lawson murder.  In that incident, shots were fired at three victims by a young white male perpetrator: a teenage white male victim was fired at but not struck, a teenage African-American male victim was shot but not fatally, and a teenage mixed-race male victim – Taevonne Latimer, a high school student from Eureka, California -- was pronounced dead as a result of his gunshot wounds.  On information and belief, both the perpetrator and all three victims were permanent, longtime residents of Humboldt County.  According to local news reports, "nine or ten" APD officers responded immediately to the scene of this May 2019 homicide, including current APD Chief of Police Brian Ahearn and Defendant Dokweiler.  Local news outlets also reported that witnesses were questioned by APD officers at the scene, and APD officers immediately set up a perimeter around the area in an effort to apprehend the suspect, who fled from the scene on foot.  On information and belief, responding APD officers followed proper police protocol in investigating this homicide, dispatched experienced and senior homicide investigators to respond immediately to the scene, promptly secured the crime scene and its perimeter, promptly identified and interviewed relevant witnesses, and otherwise executed their investigative duties with appropriate thoroughness, urgency and care.  The perpetrator in this murder was promptly identified, surrendered to law enforcement authorities by a family member, and is presently facing charges for Taevonne Latimer's murder in Humboldt County Superior Court.

112.    APD officers unquestionably knew how to properly and effectively render immediate life-saving medical assistance to gravely wounded persons at the scene of their injury, despite the fact that Defendants failed to properly and effectively render such immediate medical assistance to Mr. Lawson at the scene where he was fatally stabbed in April 2017.  In or around May 2016, for instance, APD Officers Matthew O'Donovan and Don Arminio rendered

immediate, effective and successful life-saving medical assistance to a "drunk and threatening" white male subject after shooting him four (4) times near the intersection of 14th and H Streets. In that instance, as a result of the immediate medical assistance rendered by APD officers at the scene, the gravely wounded shooting victim survived his injuries.  On information and belief, the victim of that shooting was a permanent resident of Humboldt County.

113.   Throughout 2017, and specifically at the time of Mr. Lawson's murder, Defendant City employed no African-American officers on its police force.  The APD eventually hired one African-American police officer in 2018, but that officer was not and has never been assigned to the Lawson murder investigation.  Throughout 2017, all of the APD officers who worked on the Lawson homicide investigation were of Caucasian descent.  At some point in 2018, one officer of Latinx descent, Chris Ortega, was assigned to the Lawson homicide investigation on less than a half-time basis.  No African-American officer ever has been permitted to participate in any aspect of the Lawson homicide investigation.

114.   Defendants willfully and/or recklessly refused and/or failed to perform even a minimally adequate investigation into the murder of Mr. Lawson pursuant to an established policy or custom within the APD, endorsed, adopted and promulgated by its highest policymaking authorities (including but not limited to Defendant Chapman), to invest lesser time, efforts, and investigative resources towards investigating and solving violent crimes within Defendant City in which the victims are non-Caucasian, and specifically in which the victims are young African-American males, than Defendants devote towards investigating and solving violent crimes perpetrated against Caucasian victims.

115.   In addition, Defendants willfully and/or recklessly refused and/or failed to perform even a minimally adequate investigation into the murder of Mr. Lawson pursuant to an established policy or custom within the APD, endorsed, adopted and promulgated by its highest policymaking authorities (including but not limited to Defendant Chapman), to invest lesser time, efforts, and investigative resources towards investigating and solving violent crimes within Defendant City in which the victims are not permanent residents of Humboldt County than

Defendants devote towards investigating and solving violent crimes perpetrated against permanent and/or longtime residents of Humboldt County.

116.    That Defendants' consistently willful and/or reckless refusal and/or failure to perform even a minimally adequate investigation into Mr. Lawson's murder was motivated by its unfair and discriminatory bias and animus against victims of violent crime who are persons of color (and specifically African-American males) and/or who are not permanent residents of Humboldt County is illustrated by a multitude of actions and omissions described in more detail above, including without limitation:

(a)    Defendants City, Chapman and Dokweiler's refusal to send any experienced homicide detective to the scene of Mr. Lawson's murder as a first-responder, reflecting the low priority given to the investigation of violent crimes involving victims who are persons of color generally, and African-American males specifically, and/or victims who are not permanent residents of Humboldt County (the home where the party at which Mr. Lawson was murdered took place was located in an area of Defendant City well-known as predominantly rental housing for temporary residents attending HSU);

(b)    Defendants Losey and Arminio's and other first-responding APD officers' refusal to render immediate medical aid to Mr. Lawson or to attempt to investigate the circumstances of his murder until the young, predominantly African-American male partygoers – referred to by APD officers in radio transmissions as a "large, aggressive crowd" – had been substantially dispersed, reflecting not only a predominant interest in crowd control over Mr. Lawson's well-being and investigative integrity and urgency, but also a classically stereotypical racist trope that young African-American males are usually threatening and "aggressive";

(c)    Defendants Chapman, Dokweiler, Losey, Arminio and other responding APD officers' refusal and/or failure to even attempt to cordon off any portion of the crime scene from the public until a minimum of several hours after initially responding to the scene, and when that attempt was finally made, refusal and/or failure to cordon off the actual location where Mr. Lawson was stabbed, again reflecting the carelessness, apathy and lack of priority and

investigative urgency shown to victims of violent crime who are persons of color, African-American males and/or perceived to be only transitory residents of Humboldt County;

(d)      Responding APD officers' and EMTs' rough handling and dragging of Mr. Lawson's body as he lay dying at the scene of his murder, which shocked observers to the point of immediate protest, and further reflects the carelessness, apathy and lack of priority and investigative urgency shown to victims of violent crime who are persons of color, African-American males and/or perceived to be only transitory residents of Humboldt County;

(e)      Defendant Dokweiler, Losey and other responding APD officers' failure to prevent Ms. McFarland's parents from driving Mr. Zoellner's vehicle from the scene of Mr. Lawson's murder – a vehicle which contained a bag of chef's knives used by Mr. Zoellner in his job at a local catering kitchen – again demonstrating the carelessness, apathy and lack of investigative care and priority given to victims of violent crime who are persons of color, African-American males and/or perceived to be only transitory residents of Humboldt County;

(f)      Defendant Chapman's refusal of repeated offers of assistance with the Lawson homicide investigation from experienced homicide detectives across the State of California, including without limitation the former Chief of Police of the City of Eureka, the Sheriff of Humboldt County, the Humboldt County District Attorney's Office, and Humboldt State University's Police Department, all demonstrating the lack of priority, attention, time, efforts and investigative resources devoted to victims of violent crime in Defendant City who are persons of color, African-American males and/or perceived to be only transitory residents of Humboldt County, even at the APD's highest policymaking level of authority;

(g)      Defendants Chapman and Diemer's decision to release to the public a mugshot photo of Mr. Zoellner showing his face beaten and bloodied from the altercation that ensued once Mr. Lawson's companions realized he had been fatally stabbed during his struggle with Mr. Zoellner; Defendants' conscious choice to release this mugshot photograph of Mr. Zoellner, rather than a photo taken after his injuries had been cleaned and attended to, was designed to and did in fact fuel false but widespread public perception in the Humboldt County area that Mr. Zoellner was the victim of an unprovoked and serious assault by Mr. Lawson, rather than the

SECOND AMENDED COMPLAINT

MICHELLE CHARMAINE LAWSON v. CITY OF ARCATA *et al.*

likely perpetrator of Mr. Lawson's murder, and was again designed to shield the rights and
interests of a Caucasian native Humboldt County resident over the rights and interests of an
African-American college student residing in Humboldt County only temporarily;

(h)     Defendants Chapman, Dokweiler and Diemer's willful and intentional
interference with and obstruction of the investigation conducted by former FBI agent Tom
Parker into Mr. Lawson's murder pursuant to a contract with Defendant City, including but not
limited to Defendants' intentional dissemination of knowing falsehoods and deliberate material
misstatements to Mr. Parker regarding relevant investigative details and plans of action,
withholding of relevant investigative information from Mr. Parker and intentionally false denials
of having done so, and willful refusal to implement Mr. Parker's further investigative
recommendations within any reasonable period of time, if at all, and all of which again
demonstrate Defendants' abject lack of interest in solving and prosecuting violent crimes
perpetrated against non-Caucasian victims and/or non-permanent residents of Humboldt County;

(i)     As discussed in more detail below, Defendants Dokweiler and Arminio's efforts
to shield Ms. Ortega from any uncomfortable interaction with Plaintiff by escorting her home
from the APD station in a police vehicle, while Defendant Dokweiler simultaneously berated
Plaintiff and literally escorted her out the back door of the APD's station – another classic
example of racially loaded conduct with a long history of abuse against African-Americans
reflecting Defendants' animus and bias against victims of violent crime who are African-
American males and/or non-permanent residents of Humboldt County, and its preference for
protecting the rights and interests of non-African Americans who are permanent residents of
Humboldt County over and above the rights and interests of African-Americans who do not
reside permanently in Humboldt County; and

(j)     Defendants' public release and publication in March 2019 of still footage of
young male persons of color who attended the April 2017 party where Mr. Lawson was slain,
taken from police dashboard camera footage in the APD's sole custody and possession since the
night of Mr. Lawson's murder, with the unstated but strong implication that the young African-
American and Latinx male college students predominantly shown in those photos were potential

SECOND AMENDED COMPLAINT

MICHELLE CHARMAINE LAWSON v. CITY OF ARCATA *et al.*

suspects in Mr. Lawson's murder, and not innocent bystanders whom the APD deliberately allowed to leave the scene of the crime on the night of Mr. Lawson's murder without first obtaining their names or contact information where they could be reached, a decision which further underscores Defendants' bias and animus against persons of color, particularly African-American males, and HSU students perceived as only temporary residents of Humboldt County.

117.    The discriminatory animus and bias harbored by Defendants against Plaintiff, Mr. Lawson and other African-American victims of violent crime in Defendant City exhibits the same characteristics and intent as the more blatant and obvious racial discrimination commonly directed against African-Americans throughout the United States in the Jim Crow era and earlier, but manifests in a more subtle, less confrontational manner than racism in the pre-Civil Rights era. While such racial discrimination usually avoids expression in the form of direct and blatant racial slurs and other aggressively confrontational speech, such forms of racism are just as deeply embedded and systematically entrenched in cultural and governmental mechanisms of power as the racism of earlier decades, and are just as influential and potentially even more insidious. As such, while more subtly expressed than overt and blatant 1950's style racially discriminatory attitudes, Defendants' discriminatory bias against and disparate treatment of Plaintiff and Mr. Lawson compared to others similarly situated as a result of their race and/or ethnicity is no less objectionable and no less actionable.

118.    Moreover, Defendants City and Diemer's disparate and disfavored treatment of Plaintiff compared to Caucasian permanent residents of Humboldt County is illustrated by Defendant City's strikingly different responses to parallel lawsuits filed against it by Plaintiff and Mr. Zoellner. In response to Mr. Zoellner's lawsuit, Defendant City made no attempt to seek dismissal of Mr. Zoellner's facially deficient claims, asserted on a pro per basis, and instead promptly filed an answer to Mr. Zoellner's complaint, enabling that case to move forward to immediate discovery. Defendant City declined to seek dismissal of Mr. Zoellner's claims, despite the fact that further court proceedings in that matter are likely to lead to the public disclosure of previously confidential and unrevealed factual information directly related to the APD's purportedly "ongoing" investigation of Mr. Lawson's murder. Throughout the entirety of

SECOND AMENDED COMPLAINT

MICHELLE CHARMAINE LAWSON v. CITY OF ARCATA *et al.*

that investigation, Defendants have steadfastly and consistently refused to provide such factual information to Plaintiff, even subject to confidentiality obligations, despite her repeated requests, and have refused to disclose to Plaintiff her son's autopsy report, any of the police reports or documents relating to her son's murder, or even basic information regarding which investigative steps have been taken and which still remain to be completed.  In response to Plaintiff's claims against Defendants, Defendant City – in contrast to its handling of the claims brought against it by Mr. Zoellner – elected not to answer and proceed to discovery, and instead filed a motion to dismiss Plaintiff's complaint.  This deliberate strategy is only Defendants' latest in a two (2)-year series of intentional and willful efforts to withhold from Plaintiff even the most basic of information relating to the murder of her oldest son and Defendants' subsequent investigation of his homicide.

119.    On information and belief, from the time Plaintiff began making such public comments and continuing until Mr. Ehle was retained by the City as its Interim Chief of Police nearly a year later, in retaliation against Plaintiff for her public criticism and motivated by malice and vindictiveness against Plaintiff, Defendants effectively ceased working on the Lawson murder investigation and took virtually no substantive steps to investigate it further.

120.    On or around September 2017, Plaintiff was waiting in the Arcata Plaza shortly before a scheduled meeting with Defendant Dokweiler when she observed Ms. Ortega walking by the plaza.  Plaintiff attempted to speak with Ms. Ortega, and in response, Ms. Ortega fled approximately two (2) blocks to Arcata City Hall, where the APD station is located.  Seeing Ms. Ortega run to the APD station, Plaintiff followed, since her meeting with Defendant Dokweiler was scheduled to start momentarily.  Upon arriving at the APD station, Plaintiff was met by Defendant Dokweiler, who came outside to confront her and admonished her for "chasing" Ms. Ortega.  Defendant Dokweiler then told Plaintiff that he had no news to report to her, since he was now the only detective assigned to the Lawson investigation and he had been unable to work on the case for several weeks, and proceeded to direct Plaintiff out of the APD station through its rear exit.  In the meantime, another APD officer escorted Ms. Ortega out the front door of the APD station and drove her home to McKinleyville in her patrol car.

121.     Rather than perform the police work necessary to properly investigate and solve Mr. Lawson's murder, Defendants instead conspired among themselves and with others to allow the investigation to languish without progress – hoping the public, Plaintiff, and Mr. Lawson's friends and family would quietly put the matter behind them – while issuing deliberately false and misleading statements to Plaintiff, her family, Mr. Lawson's friends, and members of the public assuring them that the Lawson homicide was being actively and appropriately investigated, that offers of assistance from outside law enforcement agencies were being eagerly sought and accepted, and that the investigative recommendations made by Mr. Parker were being followed.  In fact, none of these statements made by Defendants were true.

122.     Defendants refused and/or failed to conduct even a minimally adequate investigation into Mr. Lawson's murder because of their bias, discrimination and/or animus towards Plaintiff and Mr. Lawson as a result of their African-American race and their permanent residence outside Humboldt County, and/or because of their desire to shield and/or protect Mr. Zoellner due to his status as a native, permanent Humboldt County resident of Caucasian descent.

123.     Defendants deliberately and intentionally treated Plaintiff and Mr. Lawson differently from other similarly situated persons due to their race and/or their location of residence, without any rational basis.

124.     City customs, policies and practices described in the foregoing paragraphs and throughout this Complaint were consciously approved at the highest policy-making levels for decisions involving the APD, and were a direct and proximate cause of the injuries suffered by Plaintiff.  The actions of Defendants Chapman, Dokweiler, Losey, Arminio and Diemer reflect Defendant City's practices, procedures, regulations and/or customs to selectively enforce the laws of the State of California and to selectively provide law enforcement services to members of the public.

125.     Specifically, Defendant City maintains a pattern and practice of selectively enforcing those laws, policies and procedures that relate to homicide and the investigation of

homicides within Defendant City limits, based upon race and/or ethnicity, permanent residency status within Humboldt County, or otherwise without rational basis.

126.    The above-described customs, policies, practices, acts and/or omissions were allowed to exist and/or occur because the City and its authorized municipal policymakers (including but not limited to Defendants Chapman and Diemer) declined to implement sufficient training and/or any legitimate mechanism for oversight or punishment of misconduct.  Indeed, the City's system for exercising oversight of its Chief of Police, the APD's training and operations, and the APD's system for exercising oversight of major homicide investigations, were and are, for all practical purposes, nonexistent.

127.    APD officers who failed to meet minimum levels of professional competency in homicide investigations had every reason to know that they not only enjoyed *de facto* immunity from any adverse employment consequences or departmental discipline as a result of their professional shortcomings, but that they also stood to be rewarded with promotions despite their lack of basic competence, as exemplified by Defendant Dokweiler's promotion from Detective Sergeant to Lieutenant in or about January 2018 – purportedly, according to Defendant Chapman, as a "reward" for his "hard work" in connection with the Lawson homicide investigation.  In this way, this system proximately caused abuses and violations of constitutional rights, such as the misconduct at issue in this case.   This system was well known to APD command personnel, including but not limited to Defendant Chapman, who themselves participated in, perpetuated and benefited from it.

128.    In doing the acts described above, Defendants deliberately and intentionally attempted to impede, obstruct or defeat the due course of justice in the State of California with the intent to injure Plaintiff, and to deny Plaintiff the right of equal protection of laws guaranteed by the Fourteenth Amendment to the United States Constitution, 42 U.S.C. Section 1983, and the California Constitution.  Defendants took such deliberate actions due to Plaintiff and Mr. Lawson's African-American race and/or permanent residency outside of Humboldt County, or otherwise without rational basis.

129.    As a result of Defendants' various acts and omissions as alleged herein, Plaintiff has suffered injuries consisting of emotional distress, anxiety, mental suffering, and other general and special damages.

## FIRST CAUSE OF ACTION

**42 U.S.C. § 1983 – Denial of Equal Protection in Violation of the Fourteenth Amendment**

(Against All Defendants)

130.    Plaintiff incorporates by reference paragraphs 1 through 129 above as if fully set forth herein.

131.    42 U.S.C. Section 1983 provides that:

Every person, who under color of any statute, ordinance, regulation, custom or usage of any state or territory or the District of Columbia subjects or causes to be subjected any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges or immunities secured by the constitution and law shall be liable to the party injured in an action at law, suit in equity, or other appropriate proceeding for redress . . .

132.    Municipal government and law enforcement officials acting under color of state law, including officials of Defendant City, may not selectively deny protective services to certain disfavored minorities, or otherwise discriminate in the provision of such services on the basis of race, ethnicity, permanent residence in another county, or other classifications lacking in rational basis.

133.    The investigation of violent crimes and the arrest of violent criminal offenders are among the protective services as to which municipal government and law enforcement officials acting under color of state law, including officials of Defendant City, may not discriminate on the basis of race, ethnicity, permanent residence in another county, or other classifications lacking in rational basis.

134.    Municipal government and law enforcement officials acting under color of state law, including officials of Defendant City, may not selectively deny governmental services (including but not limited to the investigation of violent crime and the arrest and prosecution of violent criminal offenders) to disfavored minorities, or otherwise discriminate in the provision of such services on the

basis of race, ethnicity, permanent residence in another county, or other classifications lacking in rational basis, regardless of whether such services may be characterized as "protective."

135.   Plaintiff in this action is a citizen of the United States, and Defendants to this claim are "persons" for purposes of 42 U.S.C. Section 1983.

136.   At all times relevant herein, Defendants Chapman, Dokweiler, Losey, Arminio and Diemer were acting under the color of state law in their capacity as Arcata police officers and/or City officials, and their acts and/or omissions as alleged herein were conducted within the scope of their official duties or employment.

137.   At all times relevant herein, Plaintiff had the clearly established constitutional right under the Fourteenth Amendment to the United States Constitution to enjoy the equal protection of the laws, including but not limited to the full and equal benefit of police and law enforcement services provided by the City of Arcata.

138.   At all times relevant herein, any reasonable police officer and/or city official knew or should have known of these rights, as they were clearly established at that time.

139.   Defendants' conduct was undertaken with the purpose of depriving Plaintiff of the equal protection and benefits of the law and equal privileges and immunities under the law in violation of the Fourteenth Amendment based on Plaintiff's race and/or ethnicity, her permanent residency outside of Humboldt County, and/or personal animus towards Plaintiff based on her public statements regarding Defendants' conduct of the investigation into her son's murder.

140.   Defendants engaged in the acts and/or omissions described by this Complaint willfully, maliciously, in bad faith, and in reckless disregard of Plaintiff's federally protected rights.

141.   The acts or omissions of all Defendants were moving forces behind Plaintiff's injuries.

142.   Defendants acted in concert and joint action with each other to deprive Plaintiff of her right to equal protection and benefits of the law and equal privileges and immunities under the law in violation of the Fourteenth Amendment by failing to reasonably investigate Mr.

SECOND AMENDED COMPLAINT

MICHELLE CHARMAINE LAWSON v. CITY OF ARCATA *et al.*

Lawson's murder, by making false representations and misleading statements to Plaintiff about the actions being taken to investigate her son's murder, and by blatantly lying about working with other law enforcement officials and agencies in order to solve this crime.

143. By failing to conduct even a minimally adequate investigation into Mr. Lawson's murder, consistent with well-accepted police protocols, on the basis of Plaintiff's, Mr. Lawson's, or Mr. Zoellner's race and/or ethnicity or county of residence, Defendants caused plaintiff to be deprived of the equal protection of the laws.

144. In addition, or in the alternative, by failing to conduct even a minimally adequate investigation into Mr. Lawson's murder, consistent with well-accepted police protocols, as a result of animus towards Plaintiff as a result of her public statements criticizing their conduct of the investigation into her son's murder, Defendants caused Plaintiff, as a "class of one," to be deprived of the equal protection of the laws, by intentionally treating her differently from others similarly situated, with no rational basis for the difference in treatment.

145. The acts or omissions of Defendants, as described herein, intentionally deprived Plaintiff of her constitutional and statutory rights and caused her other damages.

146. Defendants are not entitled to qualified immunity for the acts and/or omissions alleged herein.

147. At all times relevant hereto, Defendants were acting pursuant to municipal custom, policy, decision, ordinance, regulation, widespread habit, usage, or practice in their actions pertaining to Plaintiff.

148. As a proximate result of Defendants' unlawful conduct, Plaintiff has suffered emotional injuries and other damages and losses as described herein, entitling her to compensatory and special damages, in amounts to be determined at trial. As a further result of Defendants' unlawful conduct, Plaintiff has incurred special damages, including medically related expenses and may continue to incur further medically and other special damages related expenses, in amounts to be established at trial.

149.   On information and belief, Plaintiff may suffer damages as a result of the acts and omissions of Defendants as alleged herein, in amounts to be ascertained in trial.  Plaintiff is further entitled to attorneys' fees and costs pursuant to 42 U.S.C. Section 1988, pre-judgment interest and costs as allowable by federal law.

150.   In addition to compensatory, economic, consequential and special damages, Plaintiff is entitled to punitive damages against each of the individually named Defendants under 42 U.S.C. Section 1983, in that the actions of each of these individual Defendants have been taken maliciously, willfully or with a reckless or wanton disregard of the constitutional and statutory rights of Plaintiff.

<div align="center">

**SECOND CAUSE OF ACTION**

**42 U.S.C. § 1983 – Deliberately Indifferent Policies, Practices, Customs, Training, and Supervision in Violation of the Fourteenth Amendment and 42 U.S.C. § 1981**

(Against City of Arcata and Defendants Chapman and Diemer only)

</div>

151.   Plaintiff incorporates by reference paragraphs 1 through 150 above as if fully set forth herein.

152.   42 U.S.C. Section 1983 provides that:

Every person, who under color of any statute, ordinance, regulation, custom or usage of any state or territory or the District of Columbia subjects or causes to be subjected any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges or immunities secured by the constitution and law shall be liable to the party injured in an action at law, suit in equity, or other appropriate proceeding for redress . . .

153.   Plaintiff in this action is a citizen of the United States and Defendants to this claim are "persons" for purposes of 42 U.S.C. Section 1983.

154.   At all times relevant herein, Defendants to this claim were acting under the color of state law.

155.   At all times relevant herein, Plaintiff had the clearly-established rights to enjoy the equal protection and benefits of the law and equal privileges and immunities under the law, to be free from racial discrimination in law enforcement, and to enjoy

substantive due process, all guaranteed by the Fourteenth Amendment to the United States Constitution and other applicable federal law.

156.   At all times relevant herein, Defendants City, Chapman and Diemer knew or should have known of these rights, as they were clearly established at that time.

157.   The acts or omissions of Defendants, as described herein, intentionally deprived Plaintiff of her constitutional and statutory rights and caused her other damages.

158.   Defendants are not entitled to qualified immunity for the acts and/or omissions alleged herein.

159.   At all times relevant herein, Defendants Chapman and Diemer were policymakers for Defendant City and the APD, and in that capacity established policies, procedures, customs, and/or practices for the same.

160.   Defendants City, Chapman and Diemer developed and maintained policies, procedures, customs, and/or practices exhibiting deliberate indifference to the constitutional rights of citizens, which were moving forces behind and proximately caused the violations of Plaintiff's constitutional and federal rights as set forth herein, and resulted from a conscious or deliberate choice to follow a course of action from among various available alternatives.

161.   Defendants City, Chapman and Diemer developed and maintained long-standing, department-wide APD customs, law enforcement-related policies, procedures, customs, practices, and/or failed to properly train and/or supervise APD officers in a manner amounting to deliberate indifference to the constitutional rights of Plaintiff and of the public.

162.   The deliberately indifferent training and supervision provided by Defendants City, Chapman and Diemer resulted from a conscious or deliberate choice to follow a course of action from among various alternatives available to them, and were moving forces in the constitutional and federal violation injuries complained of by Plaintiff.

163.   As a proximate result of Defendants' unlawful conduct, Plaintiff has suffered emotional injuries and other damages and losses as described herein, entitling her to compensatory and special damages, in amounts to be determined at trial.  As a further result of

Defendants' unlawful conduct, Plaintiff has incurred special damages, including medically related expenses and may continue to incur further medically and other special damages related expenses, in amounts to be established at trial.

164.    On information and belief, Plaintiff may suffer damages as a result of the acts and omissions of Defendants as alleged herein, in amounts to be ascertained in trial.  Plaintiff is further entitled to attorneys' fees and costs pursuant to 42 U.S.C. Section 1988, pre-judgment interest and costs as allowable by federal law.

165.    Plaintiff seeks appropriate declaratory and injunctive relief pursuant to 42 U.S.C. Section 1983 to redress Defendants' above-described ongoing deliberate indifference in policies, practices, habits, customs, usages, training and supervision with respect to the rights described herein, which Defendants have no intention of voluntarily correcting despite the obvious need for and recommendations to adopt such corrections.

## THIRD CAUSE OF ACTION

### 42 U.S.C. § 1985(3) - Conspiracy to Deprive Plaintiff of Constitutional Rights

(Against All Defendants)

166.    Plaintiff incorporates by reference paragraphs 1 through 165 above as if fully set forth herein.

167.    As described more fully above, each of the Defendants conspired, directly or indirectly, for the purpose of depriving Plaintiff of her rights to equal protection of the law and substantive due process.

168.    In so doing, Defendants took actions or engaged in omissions in furtherance of this conspiracy, causing injury to Plaintiff.

169.    Defendants conspired by concerted action to accomplish an unlawful purpose by an unlawful means.  Specifically, Chapman and Diemer purposefully made false statements to Plaintiff about the investigation into her son's murder.  Defendants worked in concert to provide false information about their investigative activities and the alleged participation of other law enforcement agencies, and testing of forensic evidence from April 2017 to the present.

170.    In furtherance of this conspiracy, each Defendant committed overt acts and was an otherwise willful participant in joint activity.

171.    The misconduct, acts and omissions complained of herein were undertaken with malice, willfulness, and reckless indifference to Plaintiffs' rights.

172.    The misconduct, acts and omissions complained of herein were undertaken pursuant to the policy and practice of Defendant City and the APD in the manner described more fully in preceding paragraphs, and was tacitly ratified by policymakers for Defendant City with final policymaking authority, including but not limited to Defendants Chapman and Diemer.

173.    As a direct and proximate result of the illicit prior agreement referenced above, Plaintiff's rights were violated, and she suffered financial damages, as well as severe emotional distress and anguish, as more fully alleged above.

## FOURTH CAUSE OF ACTION

### 42 U.S.C. § 1983 - Conspiracy to Deprive Plaintiff of Constitutional Rights

(Against All Defendants)

174.    Plaintiff incorporates by reference paragraphs 1 through 173 above as if fully set forth herein.

175.    As described more fully above, each of the Defendants conspired, directly or indirectly, for the purpose of depriving Plaintiff of her rights to equal protection of the law and substantive due process.

176.    In so doing, Defendants took actions or engaged in omissions in furtherance of this conspiracy, causing injury to Plaintiff.

177.    Defendants conspired by concerted action to accomplish an unlawful purpose by an unlawful means.

178.    In furtherance of this conspiracy, each of the co-conspirators committed overt acts and was an otherwise willful participant in joint activity.

179.    The misconduct, acts and omissions complained of herein were undertaken with malice, willfulness, and reckless indifference to Plaintiffs' rights.

SECOND AMENDED COMPLAINT

MICHELLE CHARMAINE LAWSON v. CITY OF ARCATA *et al.*

180.    The misconduct, acts and omissions complained of herein were undertaken pursuant to the policy and practice of Defendant City and the APD in the manner described more fully in preceding paragraphs, and was tacitly ratified by policymakers for Defendant City with final policymaking authority, including but not limited to Defendants Chapman and Diemer.

181.    As a direct and proximate result of the illicit prior agreement referenced above, Plaintiff's rights were violated, and she suffered financial damages, as well as severe emotional distress and anguish, as more fully alleged above.

### FIFTH CAUSE OF ACTION

#### Civil Conspiracy

(Against All Defendants)

182.    Plaintiff incorporates by reference paragraphs 1 through 181 above as if fully set forth herein.

183.    As described more fully in the preceding paragraphs, Defendants, acting in concert with other known and unknown co-conspirators, conspired by concerted action to accomplish an unlawful purpose by unlawful means.

184.    In furtherance of this conspiracy, each Defendant committed overt acts and was an otherwise willful participant in joint activity.

185.    The misconduct, acts and omissions complained of herein were undertaken with malice, willfulness, and reckless indifference to Plaintiffs' rights.

186.    As a proximate result of Defendants' conspiracy, Plaintiff suffered damages, including severe emotional distress and anguish, as more fully alleged above.

### SIXTH CAUSE OF ACTION

#### Gross Negligence

(Against All Defendants)

187.    Plaintiff incorporates by reference paragraphs 1 through 145 above as if fully set forth herein.

188.    Defendants had a duty to Plaintiff to make reasonable efforts to investigate the murder of Mr. Lawson.  In addition, Arminio had a duty to continue providing emergency medical

services once she commenced providing such services.

189.    As described in more detail above, Defendants breached their duty of care to Plaintiff by recklessly or grossly negligently: (1) failing to investigate and continuously making false statements to Plaintiff about the status of the investigation; (2) lying to Plaintiff about investigation & its progress; (3) failing to create, maintain, and follow adequate policies, practices and procedures and implement training; (4) failing to continue providing emergency medical services after commencement of such activity; and (5) such other and further grossly negligent and/or reckless conduct as may be discovered during the pendency of this action.

190.    As a direct and proximate result of Defendants' grossly negligent and/or reckless conduct, as described above, Plaintiff has been harmed and incurred damages, including severe emotional distress, in an amount to be proven at trial.

191.    Defendants' grossly negligent and/or reckless conduct, as alleged herein, was malicious, oppressive, or in conscious disregard of Plaintiff's rights, thus entitling Plaintiff to an award of punitive damages pursuant to California Civil Code Section 3294.

## SEVENTH CAUSE OF ACTION

### Intentional Infliction of Emotional Distress

(Against All Defendants)

192.    Plaintiff incorporates by reference paragraphs 1 through 191 above as if fully set forth herein.

193.    Defendants' acts, omissions and misconduct as described herein were extreme, outrageous, and shocking to the conscience.  Defendants intended to cause, or were in reckless disregard of the probability that their conduct would cause, severe emotional distress to Plaintiff, as more fully alleged above.  Plaintiff eldest son was brutally murdered on April 15, 2017.  Her only solace was the belief that Defendants were actively pursuing her son's murderer, as represented by Chapman and Diemer.  The false representations and statements made by Chapman, Losey and Diemer over the past year and a half caused Plaintiff further and unnecessary trauma.

194.    Said actions and conduct did directly and proximately cause severe emotional

distress to Plaintiff, and thereby constituted intentional infliction of emotional distress.

195.    The misconduct described in this Count was undertaken with malice, willfulness, and reckless indifference to the rights of others, including Plaintiff.

196.    As a proximate result of Defendants' wrongful acts, Plaintiff suffered damages, including severe emotional distress and anguish, as is more fully alleged above.

## EIGHTH CAUSE OF ACTION

### Negligent Infliction of Emotional Distress

(Against All Defendants)

197.    Plaintiff incorporates by reference paragraphs 1 through 196 above as if fully set forth herein.

198.    Defendants' acts, omissions, and misconduct as described herein were grossly negligent and/or reckless.

199.    Said actions and conduct did directly and proximately cause severe emotional distress to Plaintiff.

200.    As a proximate result of Defendants' wrongful acts, Plaintiff suffered damages, including severe emotional distress and anguish, as is more fully alleged above.

## PRAYER FOR RELIEF

Plaintiff thus prays that this Court enter judgment in her favor and against each of the Defendants and grant:

1.  Compensatory and consequential damages, including damages for emotional distress, humiliation, loss of enjoyment of life, and other pain and suffering on all claims allowed by law in an amount to be determined at trial;

2.  Economic losses on all claims allowed by law;

3.  Special damages in an amount to be determined at trial;

4.  Punitive damages on all claims allowed by law against individual Defendants and in an amount to be determined at trial;

SECOND AMENDED COMPLAINT

MICHELLE CHARMAINE LAWSON v. CITY OF ARCATA *et al.*

5.  Attorneys' fees and the costs associated with this action under 42 U.S.C. Section 1988, including expert witness fees, on all claims allowed by law;

6.  Pre- and post-judgment interest at the lawful rate; and

7.  Any further relief that this court deems just and proper, and any other appropriate relief at law and equity.

## DEMAND FOR JURY TRIAL

Plaintiff hereby demands a jury trial on all issues triable to a jury.

Dated:  June 25, 2019                    Respectfully Submitted,

/s/ Kyndra S. Miller
_____
Kyndra S. Miller
Shelley K. Mack
Attorneys for Plaintiff
MICHELLE CHARMAINE LAWSON

SECOND AMENDED COMPLAINT

MICHELLE CHARMAINE LAWSON v. CITY OF ARCATA *et al.*