# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| **MICHELLE CHARMAINE LAWSON,**<br><br>Plaintiff**,**<br><br>vs.<br><br>**CITY OF ARCATA, ET AL.,**<br><br>Defendants**.** | CASE NO. 18-cv-07238-YGR<br><br>**ORDER GRANTING IN PART AND DENYING IN PART MOTION TO DISMISS**<br><br>Re: Dkt. No. 43 |

Plaintiff Michelle Charmaine Lawson brings this action against defendants City of Arcata (the "City"), former Chief of Police for the Arcata Police Department ("APD") Thomas Chapman, Lieutenant and Detective Sergeant for the City Tod Dokweiler, Detective for the City Eric Losey, Police Officer for the City Krystle Arminio, City Manager for the City Karen Diemer, and Does 1 through 100 asserting eight causes of action arising out of the death of her son, David Josiah Lawson ("Mr. Lawson").[1] (Dkt. No. 33 ("SAC").) Now before the Court is defendants' motion to dismiss plaintiff's SAC for failure to state a claim under Federal Rule of Civil Procedure 12(b)(6).[2] (Dkt. No. 43 ("MTD").)

---

[1] The SAC includes four federal claims – (1) denial of equal protection in violation of the Fourteenth Amendment, pursuant to 42 U.S.C. § 1983 ("Section 1983"); (2) deliberately indifferent policies, practices, customs, training, and supervision in violation of the Fourteenth Amendment and 42 U.S.C. § 1981 pursuant to Section 1983; (3) conspiracy to deprive plaintiff of her constitutional rights in violation of 42 U.S.C. § 1985(3); and (4) conspiracy to deprive plaintiff of her constitutional rights in violation of Section 1983 – as well as four state-law claims – (5) civil conspiracy; (6) gross negligence; (7) intentional infliction of emotional distress; and (8) negligent infliction of emotional distress. (SAC at 1.)

[2] In support of its motion to dismiss, the City submitted and asked that the Court consider the declaration of current APD Police Chief Brian Ahearn. (Dkt. No. 43-3; *see also* MTD at 7-8.) In response to plaintiff's opposition to the instant motion, the City withdrew Ahearn's declaration. (Dkt. No. 48.) Accordingly, the Court **DENIES AS MOOT** the City's request to consider the Ahearn declaration.

Having carefully considered the pleadings and papers submitted, and for the reasons set forth more fully below, the Court hereby **GRANTS IN PART** and **DENIES IN PART** the City's motion to dismiss.

**I.     BACKGROUND**

Relevant to the instant motion, plaintiff alleges as follows:

Plaintiff is an African-American woman who has never been a resident of Humboldt County, California and the mother of the deceased Mr. Lawson. (SAC ¶ 2.) Mr. Lawson was an African-American man and was a temporary resident of Humboldt County, California solely for the purpose of attending Humboldt State University ("HSU") in Arcata, California. (*Id.*) Individual defendants Chapman, Dokweiler, Losey, Arminio, and Diemer are each Caucasian and residents of Humboldt County, California. (*See id.* ¶¶ 4-8.)

The City is a small college town located in northern Humboldt County, California. (*Id.* ¶ 16.) The City and Humboldt County are "famously remote and isolated locales on the far northern California coast, situated behind the 'Redwood Curtain' – a moniker recalling the culture of the former Eastern bloc countries behind the 'Iron Curtain' and used by locals and non-locals alike to denote the region's lack of urban sophistication, remote and sparsely developed geography, and a notably provincial, insular 'locals versus outsiders' mentality widespread among Humboldt County residents and natives." (*Id.*) "This pervasive preference for local Humboldt County residents over 'outsiders' is widespread amongst county and municipal elected representatives, officials and policymakers throughout Humboldt County, including but not limited to those employed by or otherwise working on behalf of Defendant City." (*Id.*) As of July 1, 2018, the U.S. Census Department reported that approximately 79.4% of the City's population was of white or Caucasian descent and an estimated 2.6% of the City's population was of African-American descent. (*Id.* ¶ 17.)

The City is home to HSU, the northernmost and arguably most remote institution in the California State University ("CSU") system. (*Id.* ¶ 18.) During the academic year (the school year during which Mr. Lawson was murdered), HSU's student body was 3.2% African American, 43% white or Caucasian, 33.7% Latinx, and 48% were students of color or mixed race. (*Id.*) The

2

"lion's share" of HSU's minority student population is recruited from much more racially and culturally diverse areas of Southern California, and the "sharp 'town versus gown' divide" in the City is exacerbated by the facts that (1) HSU's student population is "much more heavily minority" than the native population of Humboldt County at large, and the City in particular; and (2) that most HSU students of color are not Humboldt County locals and typically do not remain in Humboldt County after completing their education at HSU. (*Id.* ¶ 19.) In April 2017, just after Mr. Lawson's murder, HSU President Dr. Lisa Rossbacher told the HSU Lumberjack student newspaper "[t]here isn't a lot of ethnic and racial diversity in this region, except for what the University contributes. We do end up being a very diverse community as a university in the midst of a region that is far less diverse. That certainly creates some tensions." (*Id.*) African-American students at HSU have experienced racist attacks from City residents as well as stereotypically discriminatory and biased interactions with APD officers based on their race and their status as "non-locals" in the community. (*Id.* ¶¶ 20, 21.) In October 2001, a 29-year-old African-American male Sociology student at HSU, Corey Clark, was murdered in Eureka after HSU's annual homecoming football game. (*Id.* ¶ 22.) No suspect was ever identified, and no one was ever arrested for or charged with Mr. Clark's murder. (*Id.*)

In April 2017, Mr. Lawson was a sophomore attending HSU and majoring in Criminal Justice. (*Id.* ¶ 23.) On the evening of April 14, 2017, continuing into the early morning hours of April 15, 2017, Mr. Lawson and his girlfriend Renalyn Bobadilla were attending a birthday party at a friend's house in the City, away from the HSU campus (the "Party").[3] (*Id.* ¶ 25.) Also attending the Party was Lila Ortega, accompanied by her friends Angelica McFarland, Naiya Wilkins, and Casey Gleaton.[4] (*Id.* ¶ 26.)

---

[3] Bobadilla is an HSU student of color, and at all times relevant to the complaint, a permanent resident of Southern California, temporarily residing in the City solely for purposes of attending college at HSU. (SAC ¶ 25.) None of Bobadilla's family members currently reside, or have ever resided, in Humboldt County, California. (*Id.*)

[4] Ortega is a woman of Caucasian, Latinx, Native American and/or mixed-race descent and a longtime permanent resident of Humboldt County, with family members who also permanently reside in Humboldt County. (SAC ¶ 26.) McFarland, Wilkins, and Gleaton are also Caucasian women and longtime permanent residents of Humboldt County with family members,

Sometime in the early morning hours of April 15, 2017, Ortega called her boyfriend, Kyle Zoellner, "to pick up her and her friends from the Party."[5] (*Id.* ¶ 27.) At approximately 2:30 a.m., Mr. Lawson and Bobadilla were leaving the Party with their friends Kristoff and Kyle Castillo, both of whom are of Latinx descent. (*Id.* ¶ 28.) Ortega, Zoellner, and Wilkins stopped Lawson, Bobadilla, and the Castillos after which Ortega accused them in an aggressive manner of stealing a missing iPhone. (*Id.* ¶¶ 28, 29.) A physical altercation ensued amongst Bobadilla, Ortega, and Wilkins, during which Zoellner was punched in the face by an unidentified person. (*Id.* ¶ 29.)

Lawson, Bobadilla, and the Castillos began to walk away from the front of the house, when Ortega and/or McFarland sprayed them in the face with what was believed to be pepper spray. (*Id.* ¶ 30.) Bobadilla ran back up the driveway and confronted Ortega and Wilkins, who then physically attacked her. (*Id.* ¶ 31.) Mr. Lawson had followed Bobadilla back up the driveway. (*Id.*) Mr. Lawson and Zoellner began fighting, and no witness at the scene (or the at the subsequent preliminary hearing following Zoellner's arrest) identified any other person involved in in this altercation other than Mr. Lawson and Zoellner. (*Id.* ¶ 32.) However, Paris Wright, an African-American HSU student and permanent resident of Southern California witnessed this altercation between Mr. Lawson and Zoellner. (*Id.* ¶ 33.) He observed Mr. Lawson and Zoellner on the ground and that Mr. Lawson had Zoellner in a headlock. (*Id.*) Wright separated Mr. Lawson and Zoellner and immediately noticed that Mr. Lawson had been stabbed. (*Id.* ¶ 34.) Mr. Lawson was stabbed multiple times with a ten-inch knife. (*Id.*) Party attendees, including McFarland, called 911 and reported the altercations and a stabbing. (*Id.* ¶ 35.)

Elijah Chandler, a friend of Mr. Lawson's and an African-American male HSU student and permanent resident of Southern California, ran over the Mr. Lawson and found him bleeding and semi-conscious in the bushes under a small tree on the right-hand side of the cul-de-sac. (*Id.* ¶

---

including immediate family members for McFarland, who also reside in Humboldt County. (*Id.*)

[5] Mr. Zoellner is a Caucasian man, a Humboldt County native, and a permanent resident of Humboldt County with immediate family members, including but not limited to his parents, who also reside in Humboldt County on a permanent basis. (SAC ¶ 27.) At the time of Mr. Lawson's murder, Zoellner was employed as a chef for a local catering company and his father was an employee either of the City or the County of Humboldt. (*Id.*)

4

36.) Chandler performed cardiopulmonary resuscitation ("CPR") on Mr. Lawson for approximately fifteen minutes before the ambulance arrived. (*Id.*)

According to defendant Dokweiler, there were a total of three APD officers on duty around 3:00 a.m. on April 15, 2017 when 911 calls started coming in from Party attendees, namely officer Jones and defendants Losey and Arminio. (*Id.* ¶¶ 39, 40.) The calls reported an "altercation/stabbing" in the 1100 block of Spear Avenue in the City. (*Id.*) APD Officer Jones arrived on scene with an automated external defibrillator ("AED") device for the purpose of providing emergency medical services to Mr. Lawson. (*Id.*) After multiple attempts to use the AED on Mr. Lawson, Jones terminated all life-saving emergency medical services because the AED was inoperable and not working. (*Id.*)

Defendant Losey was also one of the first APD officers to arrive on the scene on April 15, 2017. (*Id.* ¶ 40.) Because all of the APD officers on duty at the time of the calls were low-ranking, defendant Chapman immediately promoted Losey to detective before sending him to the scene of Mr. Lawson's murder. (*Id.*) This did not constitute standard procedure. (*Id.*) A more senior APD officer did not arrive at the scene until approximately one and a half hours after the stabbing. (*Id.* ¶ 41.) Chapman did not visit the scene of Mr. Lawson's murder on the night it occurred. (*Id.*)

During the preliminary hearing in the state case related to Mr. Lawson's murder, defendant Arminio testified as follows: She arrived at the crime scene she went directly to Mr. Lawson, saw his stab wounds, and began administering chest compressions. (*Id.* ¶ 44.) At some point, she stopped administering chest compressions in order to attend to control of the crowd of partygoers milling around the area. (*Id.*) She stopped administering life-saving chest compressions on at least two separate occasions during the fifteen-minute period it took for the ambulance to arrive on scene. (*Id.*) All of this testimony is a "blatant lie." (*Id.*) Aramino never administered chest compressions to Mr. Lawson. (*Id.*)

Defendants Dokweiler and Losey failed to instruct the APD or other officers at the scene of the murder to secure the area for purposes of evidentiary preservation and failed to take immediate steps to secure the scene themselves. (*Id.* ¶ 45.) Mr. Lawson was stabbed at

5

approximately 3:00 a.m., and APD officers began arriving on the scene shortly thereafter, but no perimeter was set up around the scene until approximately 7:00 or 8:00 a.m. (*Id.*) The cordoned-off area did not include the location where the fatal stabbing took place and encompassed only the location where Mr. Lawson finally collapsed from his injuries. (*Id.*)

At 3:15 a.m., approximately fifteen minutes after the first 911 calls, an ambulance arrived on scene. (*Id.* ¶ 51.) At 3:21 a.m. the ambulance departed for Mad River Community hospital. (*Id.*) When Mr. Lawson arrived at the hospital, he still had a heartbeat and paramedics were maintaining his respiration through CPR. (*Id.*) Mr. Lawson was rushed into surgery and at 4:07 a.m. he was pronounced dead. (*Id.*)

On the night of the murder, some, but not all, of the four women involved in the altercations were brought to the APD. (*Id.* ¶ 52.) All but one were allowed to leave without being submitted to an interview. (*Id.*) The APD took no physical evidence from these women at the time of Mr. Lawson's murder. (*Id.* ¶ 53.) APD officers in charge of securing the scene failed to secure Zoellner's vehicle at the scene of the murder and instead, allowed others to drive the vehicle away from the scene "with the bag of knives inside the vehicle that had [not] even been searched, much less processed for evidence." (*Id.* ¶ 54.) Once the vehicle was returned to Zoellner and Ortega's apartment, Ortega removed the bag of knives and brought it inside their apartment. (*Id.* ¶ 55.) During APD's first search of the apartment, the officers failed to collect and book into evidence the bag of knives. (*Id.* ¶ 56.)

At the scene of the murder, an APD officer located the murder weapon, a knife, under a vehicle and retrieved it. (*Id.* ¶ 57.) The officer only had one glove with him when he arrived at the scene and could not recall whether or not he was wearing that glove when he picked up the knife. (*Id.* ¶ 58.)

APD officers at the scene dispersed the attendees of the party and prospective witnesses to the murder without first attempting to obtain their names or contact information. (*Id.* ¶ 61.) Chapman and Dokweiler lied when they said they had interviewed thirty percent of the attendees. (*Id.*) No attendees were interviewed. (*Id.*)

Defendants and other APD officers and representatives lied to plaintiff and the public

6

regarding the progress of the investigation on multiple occasions. (*Id.* ¶¶ 70-71, 75-76, 83, 85, 100-101.)

Defendants' failures with respect to the response to and investigation of Mr. Lawson's murder differ from the treatment received by Caucasian homicide victims. (*Id.* ¶¶ 106-109.) Defendants' failures with respect to life-saving measures differ from their response to gravely wounded persons who are Caucasian. (*Id.* ¶ 112.)

## II. LEGAL STANDARD

Pursuant to Federal Rule of Civil Procedure 12(b)(6), a complaint may be dismissed for failure to state a claim upon which relief may be granted. Dismissal for failure to state a claim under Rule 12(b)(6) is proper if there is a "lack of a cognizable legal theory or the absence of sufficient facts alleged under a cognizable legal theory." *Conservation Force v. Salazar*, 646 F.3d 1240, 1242 (9th Cir. 2011) (quoting *Balistreri v. Pacifica Police Dep't*, 901 F.2d 696, 699 (9th Cir. 1988)).

The complaint must plead "enough facts to state a claim [for] relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). A claim is plausible on its face "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). If the facts alleged do not support a reasonable inference of liability, stronger than a mere possibility, the claim must be dismissed. *Id.* at 678-79; *see also In re Gilead Scis. Sec. Litig.*, 536 F.3d 1049, 1055 (9th Cir. 2008) (stating that a court is not required to accept as true "allegations that are merely conclusory, unwarranted deductions of fact, or unreasonable inferences").

A complaint that falls short of the Rule 8(a) standard may be dismissed if it fails to state a claim upon which relief can be granted. Fed. R. Civ. P. 12(b)(6). "Dismissal under Rule 12(b)(6) is appropriate only where the complaint lacks a cognizable legal theory or sufficient facts to support a cognizable legal theory." *Mendiondo v. Centinela Hosp. Med. Ctr.*, 521 F.3d 1097, 1104 (9th Cir. 2008). For purposes of ruling on a Rule 12(b)(6) motion, the Court "accept[s] factual allegations in the complaint as true and construe[s] the pleadings in the light most favorable to a nonmoving party." *Manzarek v. St. Paul Fire & Marine Ins. Co.*, 519 F.3d 1025,

1031 (9th Cir. 2008). Mere "conclusory allegations of law and unwarranted inferences are insufficient to defeat a motion to dismiss." *Adams v. Johnson*, 355 F.3d 1179, 1183 (9th Cir. 2004).

If a court dismisses a complaint, it should give leave to amend unless "the pleading could not possibly be cured by the allegation of other facts." *Cook, Perkiss & Liehe, Inc. v. N. Cal. Collection Serv. Inc.*, 911 F.2d 242, 247 (9th Cir. 1990). In making this determination, a court must bear in mind "the underlying purpose of Rule 15 to facilitate decisions on the merits, rather than on the pleadings or technicalities." *Lopez v. Smith*, 203 F.3d 1122, 1127 (9th Cir. 2000) (en banc) (alterations and internal quotation marks omitted).

### III. ANALYSIS

Defendants argue in their instant motion that (A) plaintiff's causes of action I through IV fail to state a valid claim for a race-based constitutional violation or a "class of one" claim; and (B) plaintiff's causes of action V through VIII fail because all defendants are immune from claims of inadequate investigation. (MTD at 8-11.)

#### A. Federal Claims (Counts I through IV)

Section 1983 "provides a cause of action for the 'deprivation of any rights, privileges, or immunities secured by the Constitution and laws' of the United States." *Wilder v. Virginia Hosp. Ass'n*, 496 U.S. 498, 508 (1990) (quoting 42 U.S.C. § 1983). Section 1983 is not itself a source of substantive rights, but merely provides a method for vindicating federal rights elsewhere conferred. *See Graham v. Connor*, 490 U.S. 386, 393-94 (1989). To state a claim under Section 1983, a plaintiff must allege two essential elements: (1) that a right secured by the Constitution or laws of the United States was violated and (2) that the alleged violation was committed by a person acting under the color of state law. *See West v. Atkins*, 487 U.S. 42, 48 (1988); *Ketchum v. Alameda County*, 811 F.2d 1243, 1245 (9th Cir. 1987). Parties do not dispute that defendants were acting under the color of state law with respect to the conduct alleged in the SAC. (*See* MTD; Dkt. No. 47 ("Opp.").)

Plaintiff alleges that defendants violated her right to equal protection secured by the Fourteenth Amendment to the Constitution (Count I), engaged in deliberately indifferent policies,

8

practices, customs, training, and supervision in violation of the Fourteenth Amendment and 42 U.S.C. § 1981 (Count II), and conspired to deprive plaintiff of these constitutional rights in violation of 42 U.S.C. §1985(3) and Section 1983 (Counts III and IV, respectively). (SAC ¶¶ 130-81.)

"The Equal Protection Clause of the Fourteenth Amendment commands that no State shall deny any person within its jurisdiction the equal protection of the laws, which is essentially a direction that all persons similarly situated should be treated alike." *City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 439 (1985) (internal quotations omitted). The Ninth Circuit recognizes a constitutional right under the Equal Protection Clause "to have police services administered in a non-discriminatory manner—a right that is violated when a state actor denies such protection to disfavored persons." *Elliot-Park v. Manglona*, 592 F.3d 1003, 1007 (9th Cir. 2010) (citing *Estate of Macias v. Inde*, 219 F.3d 1018, 1028 (9th Cir. 2000)): *see also DeShaney v. Winnebago Cnty. Dep't of Soc. Servs.*, 489 U.S. 189, 198 n.3 (1989) ("The State may not, of course, selectively deny its protective services to certain disfavored minorities without violating the Equal Protection Clause.").

To state a claim under Section 1983 for violation of the Equal Protection Clause, a plaintiff must allege that defendants acted with an intent or purpose to discriminate against her based on her membership in a protected class.[6] *Lee v. City of Los Angeles*, 250 F.3d 668, 686 (9th Cir. 2001). Here, plaintiff has alleged that she and her son are African-American, and therefore members of a protected class. (SAC ¶ 2.) With respect to defendants' intent or purpose to discriminate against plaintiff and her son based on that membership, plaintiff has alleged as follows:

- The City and Chapman dispatched experience homicide detectives as initial APD responders to homicides of non-African-American victims in the City but failed to dispatch

---

[6] In the alternative, a Fourteenth Amendment claim may proceed on a "class-of-one" theory, which does not depend on a suspect classification like race or gender, but rather requires the plaintiff to allege that (1) he or she has been treated intentionally differently from others similarly situated; and (2) there is no rational basis for the difference in treatment. *Village of Willbowbrook v. Olech*, 528 U.S. 562, 564 (2000); *see also Gerhart v. Lake Cnty., Mont.*, 637 F.3d 1013, 1022 (9th Cir. 2011).

9

United States District Court
Northern District of California

an experienced homicide detective to the scene of Mr. Lawson's murder. (SAC ¶¶ 40-42, 54, 66, 107-109, 111, 116.)

- The City's Chief of Police personally and immediately responded to the scene of the murder of Caucasian and non-African-America victims but failed to visit the scene of Mr. Lawson's murder on the night it occurred. (*Id.* ¶¶ 41, 60, 111.)

- Defendants failed to provide competent and adequate immediate medical attention to Mr. Lawson at the scene of the crime but adequately and competently provided immediate, life-saving medical attention to other shooting victims in the City who were Caucasian. (*Id.* ¶¶ 39, 44, 112, 116.)

- Defendants thoroughly and adequately investigate the murders of non-African-American homicide victims, in particular Caucasian victims, in the City, but failed to investigate the homicide of Mr. Lawson by failing to secure the scene, allowing witnesses to leave without interviewing them, failing to block off the area of the stabbing, failing to timely collect critical evidence, failing to take precautionary measures to avoid contamination of critical evidence, including the murder weapon, and failing to adequately staff the investigation among other failures. (*Id.* ¶¶ 45, 52, 54-55, 58-59, 61-62, 65, 88-89, 91, 92, 97, 105-111, 114, 116-118, 121-123, 125.)

These claims suffice to allege that defendants acted with an intent or purpose to discriminate. *See Swierkiewicz v. Sorema N. A.*, 534 U.S. 506, 510 (2002) ("Given that the *prima facie* case operates as a flexible evidentiary standard, it should not be transposed into a rigid pleading standard for discrimination cases."); *see also Federal Deposit Ins. Cop. v. Henderson*, 940 F.2d 465, 471 (9th Cir. 1991) ("Discriminatory intent may be proved by direct or indirect evidence."). Accordingly, the Court **DENIES** defendants' motion to dismiss plaintiff's federal claims, counts I through IV for failure to state a claim for valid race-based constitutional violation.[7]

---

[7] As the Court has found sufficient allegations of a race-based constitutional violation, the Court need not address defendants' argument on the "class-of-one" theory. Moreover, in light of this determination, the Court finds unpersuasive defendants' argument that plaintiff has failed to state a claim for conspiracy under Section 1985 because she failed to allege a cognizable claim under Section 1983. (*See* MTD at 10-11.)

10

### B. State Law Claims

California Government Code Section 821.6 provides that a public employee is not liable "for injury caused by his instituting or prosecuting any judicial or administrative proceeding within the scope of his employment, even if he acts maliciously and without probable cause." Cal. Gov. Civ. Code § 821.6. Section 815.2(b) provides that "[e]xcept as otherwise provided by statute, a public entity is not liable for an injury resulting from an act or omission of an employee of the public entity where the employee is immune from liability." *Id.* § 815.2(b).

Section 821.6 and Section 815.2(b) immunity apply to plaintiff's state law claims arising from defendants' allegedly insufficient and inadequate investigation of her son's murder. *See Ortega v. Sacramento Cnty. Dep't of Health & Human Servs.*, 161 Cal.App.4th 713, 728-33 (2008) (finding that social worker who failed to gather information from the enumerated sources in the CPS handbook, where defendants conceded that the social workers' investigation was "lousy" and ultimately resulted in the social worker making the wrong determination about returning the child to the custody of her father was nonetheless immune even though she conducted a "woefully inadequate information"); *see also Jacqueline T. v. Alameda Cnty. Child Protective Servs.*, 155 Cal.App.4th 456 (2007) (granting immunity under sections 820.2 and 821.6 for the "failure to conduct a reasonable and diligent investigation"); *Guzman v. County of Alameda*, No. C 10-2250 MEJ, 2010 WL 3702652, at *8 (N.D. Cal. Sept. 10, 2010) ("[C]ourts have recognized immunity for social workers in their investigations of child abuse complaints."); *Clarke v. Upton*, No. CV-F-07-888 OWW/SMS, 2008 WL 2025079, at *17 (E.D. Cal. May 9, 2008) ("The immunity set forth in Section 820.2 applies to claims of negligent and intentional conduct alleged in connection with a child abuse investigation....").

Plaintiff's contention that her allegations show that defendants' actions fall within the fraud exception to immunity fails. Plaintiff's argument that fraud has occurred relies on her allegations regarding defendants' statements regarding the status of the investigation but fails to "rise[] to the level of malice necessary to justify a waiver of immunity." *See Akey v. Placer County, Cal.*, No. 2:14-cv-02402-KJM-KJN, 2015 WL 1291436, at * 11 (E.D. Cal. Sep. 1, 2015); *see also* Cal. Gov. Civ. Code § 821.6 (providing for immunity "even if he acts *maliciously* and

without probable cause") (emphasis supplied).  The Court **GRANTS** defendants' motion to dismiss plaintiff's state law claims, counts IV through VIII and **DISMISSES** those claims with leave to amend.  Plaintiff may file an amended complaint to the extent that she can allege facts to suggest that immunity under Sections 821.6 and 816.2(b) does not apply, consistent with Rule 11 obligations.

### IV. CONCLUSION

For the foregoing reasons, the Court **GRANTS IN PART** and **DENIES IN PART** defendants' motion to dismiss plaintiff's SAC.  To the extent plaintiff has a basis to amend her complaint with respect to the applicability of immunity to her state law claims, she **SHALL** file, by no later than **Friday, November 8, 2019**, an amended complaint.  In the event that plaintiff wishes to stand on her current complaint, the SAC, she **SHALL** file notice of such intent by **Friday, November 1, 2019**.  Defendants' response shall be due fourteen days after plaintiff's filing.

This Order terminates Docket Number 43.

**IT IS SO ORDERED.**

Dated: October 7, 2019

_____
**YVONNE GONZALEZ ROGERS**
**UNITED STATES DISTRICT COURT JUDGE**